# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                      No. CR 23-1161 JB

DIEGO SENA,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Diego Sena's Motion to Suppress Illegally Obtained Evidence, filed March 11, 2024 (Doc. 38)("MTS"). The Court held an evidentiary hearing on May 10, 2024. See Clerk's Minutes, filed May 10, 2024 (Doc. 56). The primary issues are: (i) whether the Court should suppress evidence that a New Mexico State Police ("NMSP") officer, Officer Juan Rodriguez, who was also deputized as a Task Force Officer ("TFO") with Homeland Security Investigations ("HSI"), found inside the trunk of Defendant Diego Sena's car after smelling marijuana, receiving conflicting statements about travel plans, and observing visible signs of nervousness, because Rodriguez allegedly did not form reasonable suspicion to extend the stop beyond its original traffic purpose or form probable cause to search the trunk of Diego Sena's car, thereby violating Diego Sena's right to be free from unreasonable search and seizure under the Fourth Amendment to the Constitution of the United States; and (ii) whether the Court should suppress Diego Sena's statements, because Diego Sena was placed in custody without being read his Miranda rights, which allegedly violated his right against self-incrimination under the Fifth Amendment to the Constitution of the United States. The Court concludes that: (i) the search did not violate Diego Sena's Fourth

Amendment rights, because Rodriguez formed reasonable suspicion to extend the traffic stop and probable cause to search the trunk of Diego Sena's vehicle; and (ii) Rodriguez' roadside questioning of Diego Sena did not violate Diego Sena's Fifth Amendment rights, because the questioning did not constitute a custodial interrogation and Diego Sena's statements were voluntary.  Accordingly, the Court denies the MTS.

## FINDINGS OF FACT

This Court must state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d).  These findings of fact shall serve as the Court's essential findings for rule 12(d) purposes.  Rule 104(a) of the Federal Rules of Evidence requires that a judge decide preliminary questions relating to the admissibility of evidence, including the constitutionality of a search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  When making such determinations of admissibility, the court is "not bound by evidence rules, except those on privilege."  Fed. R. Evid. 104(a). ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress.  The United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements.  See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[1]("[T]he

---

[1]United States v. Lopez-Carillo is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

Supreme Court has made it clear hearsay is admissible in suppression hearings. . . . As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing <u>United States v. Matlock</u>, 415 U.S. 164, 172-77 (1974); <u>United States v. Sanchez</u>, 555 F.3d 910, 922 (10th Cir. 2009); <u>United States v. Miramontes</u>, 365 F.3d 902, 904 (10th Cir. 2004)).  The Court makes the following findings of fact:

**1.      <u>Rodriguez Stopped Sena for a Traffic Violation</u>.**

1.      On July 10, 2023, Rodriguez made a traffic stop after his radar recorded the car's speed at ninety-two miles per hour.  <u>See</u> Hearing Transcript at 18:2-5, taken March 21, 2024 (Rodriguez)("Tr.")[2]; Rodriguez NM State Police Report at 1 (dated July 17, 2023), admitted into evidence on May 10, 2024, as United States' Hearing Exhibit 1 ("Police Report").

---

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>United States v. Lopez-Carillo</u>; <u>United States v. Ceballos</u>, 355 F. App'x 226, 229 (10th Cir. 2009); <u>United States v. King</u>, 209 F. App'x 760, 762 (10th Cir. 2006); <u>United States v. Wilson</u>, 96 F. App'x 640, 643 (10th Cir. 2004); <u>United States v. Ravenell</u>, 810 F. App'x 625, 628 (10th Cir. 2020); <u>Appleby v. Cline</u>, 711 F. App'x 459, 464 (10th Cir. 2017); <u>Abbo v. Wyoming</u>, 596 F. App'x 709, 713 (10th Cir. 2014); <u>United States v. Pittman</u>, 782 F. App'x 663, 666 (10th Cir. 2019); <u>United States v. Lara</u>, WL 2250788, at *1 (10th Cir. 2023); and <u>United States v. Jackson</u>, 235 F. App'x 707, 711 (10th Cir. 2007)  have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[2]The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

2.      The posted speed limit at that location was seventy-five miles per hour.  See Tr. at 21:5-7 (Rodriguez, Spindle).  See also N.M.S.A. 1978, § 66-7-301 (vehicles may not exceed seventy-five miles per hour).

3.      At that time, Rodriguez was a New Mexico State Police officer with the Criminal Enforcement Unit of the State Police Canine and a Task Force Officer ("TFO") with the Homeland Security Investigation ("HSI"), which gave him authority to investigate and enforce federal crimes.  See Tr. at 10:23-24, 12:2-19, 117:21-118:11 (Eagle, King, Rodriguez, Spindle).

4.      After seeing the silver four-door Subaru driving at a high speed on the opposite side of I-40, see Tr. at 18:5-9 (Rodriguez), Rodriguez crossed the median and accelerated toward the Subaru, see Tr. at 19:6-7, 19:19-20 (Rodriguez).

5.      Rodriguez noticed that the Subaru had a paper dealership tag,[3] which can be used to hide the identity of a stolen vehicle.  See Tr. at 19:9-17 (Rodriguez, Spindle).

6.      Rodriguez followed the Subaru from about mile marker 137 to near mile marker 140, because there is a radio and telephone dead zone which can pose a safety concern for police officers. See Tr. at 19:24-21:12 (Rodriguez, Spindle).

7.      Around mile marker 139 or 140, Rodriguez activated his lights and sirens, and the Subaru pulled to the side of the road.  See Tr. at 21:11-17 (Rodriguez, Spindle); Rodriguez Dash Camera Recording at 5:03-15 (United States' Hearing Exhibit 3)(Doc. 43-2)("Rodriguez Dash Camera"); Tr. at 9:13-18 (Court, Spindle)(admitting into evidence United States' exhibits one through seventeen).

---

[3]When discussing this with Rodriguez later during the stop, Delores Sena stated that the dealership gave her that paper tag and that a license plate had just arrived at the dealership.  She did not state whether she had picked up the new license plate yet.  See Rodriguez Lapel Footage at 25:40-26:12 (Delores Sena, Rodriguez).

8.      Rodriguez approached the vehicle at 12:49 p.m. with his New Mexico State Police uniform and badge displayed.  See Tr. at 21:23-22:8 (Rodriguez, Spindle); Rodriguez Dash Camera at 5:43-5:50 (Rodriguez).

9.      Rodriguez' body camera recorded the entire traffic stop and drug search, except when another police officer was speaking or was on camera because of NMSP policy.  See Tr. at 19:24-21:12, 107:17-25 (Rodriguez, Spindle).

10.     Upon approaching the vehicle, Rodriguez asked the driver, Diego Sena, to lower the rear windows.  See Tr. at 24:3-8 (Rodriguez, Spindle); Rodriguez Dash Camera at 5:45-55 (Rodriguez); Rodriguez Lapel Camera Recording at 5:55-5:56 (United States' Hearing Exhibit 3)(Doc. 43-)("Rodriguez Lapel Footage"); Tr. at 9:13-18 (Court, Spindle)(admitting into evidence United States' exhibits one through seventeen).

11.     When Diego Sena lowered the rear windows, Rodriguez was "hit with an overwhelmingly strong intense odor" of raw marijuana.[4]  Tr. at 24:9-16 (Rodriguez, Spindle).

12.     Rodriguez noticed that there were two individuals in the car, the driver, Diego Sena, and a female passenger, Delores Sena.  See Tr. at 24:17-19 (Rodriguez, Spindle).

13.     Delores Sena is Diego Sena's mother.  See Police Report at 2; Rodriguez Lapel Footage at 9:26-9:32 (Diego Sena, Rodriguez).

---

[4]The State of New Mexico legalized recreational marijuana use on June 29, 2021, and possession of marijuana purchased at a licensed dispensary was legal under State law at the time of this traffic stop.  See N.M.S.A. 1978, § 26-2C-25(A) (2021) ("Cannabis Regulation Act"). Marijuana possession remains illegal under federal law as a Schedule I substance.  21 U.S.C. § 812(c)(d)(1).  Possession of marijuana is punishable under Section 844 of the United States Code, 21 U.S.C. § 844(a), although President Biden pardoned citizens "who committed the offense of simple possession of marijuana in violation of the Controlled Substances Act" on October 6, 2022, so new federal prosecution for marijuana possession is unlikely under the Biden Administration.  Proclamation No. 10467, 87 Fed. Reg. 61441 (Oct. 6, 2022).

14.     The weather was "super hot" with "fairly calm" winds.   Tr. at 25:21-23 (Rodriguez).

15.     Rodriguez could not identify from where the marijuana smell was coming in the vehicle.  See Tr. at 26:1-3 (Rodriguez, Spindle).

16.     Rodriguez asked Diego Sena for his driver's license and insurance, and noticed that Deigo Sena was "real shaky" when retrieving his license.   Tr. at 26:6-15 (Rodriguez, Spindle).  See Rodriguez Lapel Footage at 6:03-6:15 (Delores Sena, Diego Sena, Rodriguez).

17.     Rodriguez asked Diego Sena to get out of the vehicle to ensure that he did not have any weapons.  See Tr. at 26:22-27:4 (Rodriguez, Spindle); Rodriguez Dash Camera at 6:30-6:40 (Diego Sena, Rodriguez)

18.     Once Diego Sena was out of the vehicle, Rodriguez asked if he had a knife, and Diego Sena handed a knife to Rodriguez, who put it back inside Sena's car.  See Tr. at 27:16-19 (Rodriguez); Rodriguez Dash Camera at 6:40-6:47 (Diego Sena, Rodriguez).

19.     Rodriguez asked if Diego Sena had anything else, and Diego Sena showed him a THC cartridge,[5] which had no odor.   See Tr. at 27:19-28:13 (Rodriguez); Rodriguez Dash Camera at 6:48-6:53 (Diego Sena, Rodriguez).

20.     Rodriguez had Diego Sena keep the marijuana cartridge in his pocket.  See Tr. at 28:17-29:2 (Rodriguez, Spindle); Rodriguez Dash Camera at 6:50-6:55 (Diego Sena, Rodriguez).

---

[5]THC cartridges are a marijuana product in which THC is "condensed" into an "oil."  Tr. at 28:9-11 (Rodriguez).  Cartridges typically are attached to a battery pen, which are purchased separately from cartridges.  See Centers for Disease Control and Prevention,  E-Cigarette, or Vaping, Products Visual Dictionary, 6-8,  https://www.cdc.gov/tobacco/basic_information/e-cigarettes/pdfs/ecigarette-or-vaping-products-visual-dictionary-508.pdf.  Without a second device, such as a pen, Diego Sena could not have used the cartridge.  See Tr. at 68:14-16 (Rodriguez, Torgoley).

21.     Rodriguez then patted down Diego Sena and found no more weapons.  <u>See</u> Tr. at 29:5-10 (Rodriguez, Spindle); Rodriguez Dash Camera at 6:53-6:58 (Diego Sena, Rodriguez).

22.     After removing the knife and seeing the cartridge, Rodriguez told Diego Sena to sit in the front seat of his police vehicle instead of staying outside in the heat.  <u>See</u> Tr. at 29:12-16 (Rodriguez); Rodriguez Dash Camera at 6:53-6:58 (Diego Sena, Rodriguez).

23.     Once inside Rodriguez vehicle, Diego Sena stated that he was travelling from Gallup to Rio Rancho.  <u>See</u> Tr. at 30:9-10 (Rodriguez).

24.     Rodriguez then told Diego Sena that he would be giving Diego Sena a written warning.  <u>See</u> Tr. at 77:10-21 (Rodriguez, Torgoley); Rodriguez Lapel Footage at 7:24-7:28 (Rodriguez); Police Report at 2.

25.     After telling Deigo Sena he would receive a written warning, but before printing the warning, Rodriguez walked back to the Subaru to check its vehicle identification number ("VIN") and spoke with the passenger, Delores Sena, who was still seated in the Subaru.  <u>See</u> Tr. at 26:1-3, 31:21-23 (Rodriguez, Torgoley); Rodriguez Dash Camera at 10:30-11:46 (Rodriguez); Rodriguez Lapel Footage at 10:20-11:45 (Delores Sena, Rodriguez).

26.     Rodriguez checks the VINs of every car he stops for a traffic violation because of issues with stolen vehicles in Albuquerque.  <u>See</u> Tr. at 79:6-15, 58:21-59:2 (Rodriguez, Torgoley).

27.     Delores Sena stated that she and Diego Sena vacationed in Phoenix, and were on their way back to Rio Rancho.  <u>See</u> Tr. at 30:11-17 (Rodriguez, Spindle); Rodriguez Lapel Footage at 11:24-11:43 (Delores Sena, Rodriguez).

28.     This discrepancy in their stories drew Rodriguez' attention because from his experience, he understood Phoenix to be a known "narcotic[s] hub."   Tr. at 30:20-31:10 (Rodriguez, Spindle).

29.     The VINs passed Rodriguez' check.   See Tr. at 99:25-100:2 (Rodriguez, Torgoley).

30.     To make sure that there was a discrepancy with the travel plans, Rodriguez asked Diego Sena if they had travelled anywhere besides Gallup, and Diego Sena said they had not been anywhere except Gallup.   See Tr. at 30:25-31:3 (Rodriguez); Rodriguez Dash Camera at 13:50-14:10 (Diego Sena, Rodriguez); Rodriguez Lapel Footage at 12:15-12:33, 14:13-14:18 (Delores Sena, Diego Sena, Rodriguez).

31.     Approximately eight minutes after pulling over Diego Sena, Rodriguez returned to his police vehicle, where Diego Sena was still seated and issued Diego Sena the written warning.   See Tr. at 93:2-11; 111:17-112:5 (Rodriguez, Torgoley); Rodriguez Dash Camera at 13:12-13:35 (Diego Sena, Rodriguez); Rodriguez Lapel Footage at 12:55-13:39 (Delores Sena, Rodriguez).

**2.      Rodriguez Began the Marijuana Investigation.**

32.     After giving Diego Sena the written warning, at 12:57 p.m., Rodriguez stated that he had smelled marijuana and therefore was going to search the vehicle.   See Tr. at 32:9-33:7 (Rodriguez, Spindle); Rodriguez Dash Camera at 13:37-15:55 (Diego Sena, Rodriguez); Rodriguez Lapel Footage at 13:44-15:30 (Diego Sena, Rodriguez).

33.     Rodriguez was aware that federal prosecutions for simple marijuana possession were "disfavored," but because of the "strength of the odor," he expected that he would find a "large amount of marijuana" in the car.   Tr. at 96:14-24 (Rodriguez, Torgoley).

34.     Rodriguez explained to Diego Sena and Delores Sena that he is a federal TFO and has authority to enforce federal law under which marijuana remains illegal. Rodriguez Lapel Footage at 14:50-15:10, 16:40-16:57, 21:10-22:45 (Delores Sena, Diego Sena, Rodriguez).

35.     Diego Sena and Delores Sena did not consent to the search and actively stated their opposition to the search.  See Tr. at 33:8-19, 93:18-94:22 (Rodriguez, Spindle, Torgoley); Rodriguez Lapel Footage at 18:15-18:20, 19:45-21:05, 33:10-33:35 (Delores Sena, Diego Sena, Rodriguez).

36.     Rodriguez separated Diego Sena and Delores Sena, having Diego Sena stand eighty to 100 feet away from the vehicle on the highway shoulder and Delores Sena stand about twenty-five feet away from the vehicle.  See Tr. at 33:22-25 (Rodriguez); Rodriguez Lapel Footage at 16:02-16:08, 17:24-17:53 (Delores Sena, Diego Sena, Rodriguez).

37.     Rodriguez conducted a cursory search of the Subaru's cab, looking in the door, on the seats and center console, and briefly inside Delores Sena's purse.  See Tr. at 34:1-6 (Rodriguez, Spindle); Rodriguez Lapel Footage at 18:05-18:46 (Diego Sena, Rodriguez).

38.     Upon opening the trunk, Rodriguez saw a blue Skunk backpack,[6] a red Jordan duffel bag which had a lock on the zipper, and a hardshell suitcase.  See Tr. at 34:10-17 (Rodriguez, Spindle); Rodriguez Lapel Footage at 18:50-18:59 (Delores Sena, Rodriguez).

39.     Before backup arrived, Diego Sena approached or "slowly cre[pt] toward[ ] the vehicle," so Rodriguez decided to call backup and wait for their arrival before searching the bags' contents.  Police Report at 4.  See Tr. at 35:5-11 (Rodriguez); Rodriguez Lapel Footage at 19:50-20:40 (Delores Sena, Diego Sena, Rodriguez).

_____

[6]Skunk bags are advertised to conceal odors, such as marijuana and narcotics. See Tr. at 34:19-21 (Rodriguez).  The company's website advertises "premium odorless technology." Skunk, https://skunkbags.com/ (last visited July 2, 2024).

    **3.**      **Rodriguez' Alleged Custodial Interrogation of Diego Sena.**

    40.    Rodriguez used minimally forceful language in response to Diego Sena and Delores Sena's resistance to Rodriguez' search of the vehicle's trunk. See Rodriguez Lapel Footage at 20:29-36 (Rodriguez to Diego Sena)("You come any closer, you're going to be put in handcuffs. Do you understand? Go back to that sign."); Rodriguez Lapel Footage at 33:40-34:29 (Rodriguez to Diego Sena)(warning Diego Sena that Rodriguez would put Diego Sena in handcuffs if Diego Sena "tr[ied] interrupting" or "mess[ed] with" Rodriguez while Rodriguez searched the vehicle's trunk); Rodriguez Lapel Footage at 23:40-49 (Rodriguez to Delores Sena)("I got someone else coming by, okay? So you guys need to just behave, okay? If not, you guys are going to be put into custody. You guys don't need that, right?").

    41.    Another NMSP officer arrived on scene. See Rodriguez Lapel Footage at 30:49-31:03 (Delores Sena, Diego Sena, Rodriguez).

    42.    Before Rodriguez searched the contents of the bags in the trunk, Rodriguez discussed the option of a controlled delivery with Diego Sena and Delores Sena. See Tr. at 105:20-106:10 (Rodriguez, Torgoley); Police Report at 5; Rodriguez Lapel Footage at 27:28-27:55, 29:25-30:25, 31:50-33:21 (Delores Sena, Diego Sena, Rodriguez).

    43.    Speaking one-on-one with Diego Sena, Rodriguez explained what he and HSI could offer with a controlled delivery: "We'll deliver it to them. We'll give them fake stuff, and take them down. We don't want you, man." Rodriguez Lapel Footage at 32:27-38 (Diego Sena, Rodriguez).

    44.    In response to Diego Sena asking to speak with his mother, Rodriguez allowed Diego Sena to speak with his mother Delores Sena. See Rodriguez Lapel Footage at 34:40-35: (Rodriguez to Diego Sena).

45.     Rodriguez did not promise leniency but stated that it was possible that cooperation with a controlled delivery could lower Diego Sena's sentence.  See Rodriguez Lapel Footage at 36:00-03 (Rodriguez to Diego Sena and Delores Sena)("I don't know, but usually when people cooperate, it lessens stuff for them.").

46.     Speaking to both Diego and Delores Sena, Rodriguez did not pressure Diego Sena to agree to the controlled delivery, instead stating: "It's up to you.  It's not up to me.  I'm not forcing you by any means, okay?  I'm leaving it up to you guys, but time is of the essence to get it done."  Rodriguez Lapel Footage at 32:18-29 (Rodriguez to Diego Sena and Delores Sena).

47.     Rodriguez allowed Diego Sena to hug his mother, Delores Sena, while they decided whether to agree to the controlled delivery and immediately after they agreed to the controlled delivery.  See Rodriguez Lapel Footage at 36:29-38:00 (Rodriguez).

48.     Delores Sena expressed concern for their safety because they could be seen talking to police on the side of the highway by the potential targets of the controlled delivery.  See Rodriguez Lapel Footage at 35:33-37 (Delores Sena).

49.     Diego Sena verbally agreed to do the controlled delivery.  See Rodriguez Lapel Footage at 37:11-37:19 (Delores Sena, Diego Sena, Rodriguez).

   **4.     Rodriguez Searched the Bags in the Vehicle's Trunk.**

50.     After other NMSP officers arrived, Rodriguez searched the contents of the blue Skunk backpack, of the red Jordan duffel bag, and of the hardshell suitcase.  See Tr. at 35:24-38:17, 43:6-9, 98:17-19 (Rodriguez, Spindle); Photograph of Trunk with Closed Bags Inside (photo undated), admitted into evidence on May 10, 2024, as United States' Hearing Exhibit 4 ("Photograph of Trunk"); Rodriguez Lapel Footage at 37:44-39:05 (Diego Sena, Rodriguez).

51.     After using his pen to open the zipper of the locked blue Skunk backpack, Rodriguez found two black firearms, so he placed the backpack in his vehicle to secure the firearms.  <u>See</u> Tr. at 36:24-37:16 (Rodriguez, Spindle); Photograph of Blue Backpack with Contents Removed (photo undated), admitted into evidence on May 10, 2024, as United States' Hearing Exhibit 14 ("Photograph of Blue Backpack"); Rodriguez Lapel Footage at 37:44-38:26 (Delores Sena, Diego Sena, Rodriguez).

52.     The blue Skunk backpack also contained a bong, which had a burnt marijuana odor.  <u>See</u> Tr. at 45:4-15 (Rodriguez, Spindle); Photograph of Bong (photo undated), admitted into evidence on May 10, 2024, as United States' Hearing Exhibit 12 ("Photograph of Bong").

53.     To open the locked red Jordan duffel bag, Rodriguez "used his pen to stab through the zipper" and "peeled" open the zipper.  Tr. at 38:6-14 (Rodriguez, Spindle).  <u>See</u> Photograph of Red Jordan Duffel Bag (photo undated), admitted into evidence on May 10, 2024, as United States' Hearing Exhibit 7 ("Photograph of Red Jordan Duffel").

54.     Several clear bags of what Rodriguez identified as Fentanyl were inside the duffel bag.  <u>See</u> Tr. at 38:14-17 (Rodriguez, Spindle); Photograph of Bags of Pills Inside Red Duffel Bag (photo undated), admitted into evidence on May 10, 2024, as United States' Exhibit 8 ("Photograph of Pills").

55.     After seeing the drugs in the bags, Rodriguez returned to his vehicle and called his supervisor, who stated that he would contact HSI, and those agents would join Rodriguez and the other NMSP officers.  <u>See</u> Tr. at 39:21-40:6 (Rodriguez, Spindle); Police Report at 5; Rodriguez Lapel Footage at 39:00-39:13 (Rodriguez).

56.     HSI Agent Shayne Beckford called Rodriguez, and asked Rodriguez to transport Diego Sena, Delores Sena, and the vehicle to Route 66 Casino Gas Station.  See Police Report at 5.

57.     Rodriguez placed Diego Sena in the back of his patrol car in handcuffs, see Tr. at 101:4-10 (Rodriguez, Torgoley); Police Report at 5, and drove the Subaru to the Route 66 Gas Station west parking lot, see Tr. at 38:22-11 (Rodriguez, Spindle).  See also Rodriguez Lapel Footage at 54:30-59:29 (Diego Sena, Rodriguez).

58.     Rodriguez had not yet read Sena his Miranda[7] rights. See Tr. at 104:17-21 (Rodriguez, Torgoley).

59.     At the parking lot, Rodriguez continued searching the red duffel bag and found a "black cylindrical object" wrapped in clear plastic, which he believed to be heroin.  Tr. at 42:7-43:2 (Rodriguez, Spindle).

---

[7]Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).  The Supreme Court of the United States of America provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

60.     Rodriguez next searched the hardshell suitcase and recovered a mason jar of raw marijuana.  See Tr. at 43:6-44:3 (Rodriguez, Spindle); Photograph of Opened Hardshell Suitcase (photo undated), admitted into evidence on May 10, 2024, as United States' Hearing Exhibit 9 ("Photograph of Suitcase"); Photograph of Marijuana in Mason Jar (photo undated), admitted into evidence as United States' Hearing Exhibit 10 ("Photograph of Marijuana in Jar").

61.     The odor of raw marijuana was stronger once the suitcase was opened.  See Tr. at 44:7-10 (Rodriguez, Spindle).

**5.     HSI Agents Arrive on Scene.**

62.     When HSI federal officers, Special Agents Dean King, Shayne Beckford, and Brandi Teixeira, arrived at the parking lot, Rodriguez turned over the suspected Fentanyl, heroin, marijuana, bong, and firearms to the agents.  See Tr. at 46:12-16 (Rodriguez, Spindle); Police Report at 5.

63.     Rodriguez transferred custody of Diego Sena to the federal officers.  See Tr. at 46:20-21 (Rodriguez).

64.     King and Beckford interviewed Diego Sena in Beckford's vehicle at 2:45 p.m. See Tr. at 119:19-123:7 (Eagle, King).  See also HSI Vehicle Interview at 00:18-36:26 (United States' Hearing Exhibit 16)(Doc. 43-16)("HSI Vehicle Interview Audio Recording")(Beckford, Diego Sena, King); Tr. at 9:13-18 (Court, Spindle)(admitting into evidence United States' exhibits one through seventeen).

65.     Diego Sena expressed fear for his safety and was not resistant to the agents' questions.  See Tr. at 123:19-25 (Eagle, King).

66.     Diego Sena signed a standard Department of Homeland Security <u>Miranda</u> waiver of rights form after King read his rights to him and Diego Sena himself read aloud the waiver.[8] <u>See</u> Tr. at 125:10-128:22 (Eagle, King); Diego Sena's Signed Statement of Rights (dated July 10, 2024), admitted into evidence on May 10, 2024 as United States' Hearing Exhibit 15 ("<u>Miranda</u> Waiver Form"); HSI Vehicle Interview Audio Recording at 00:48-3:55 (Beckford, Diego Sena, King).

67.     After signing the <u>Miranda</u> Waiver Form, Diego Sena began talking to the agents without any hesitation, and did not resist or stop the interview.  <u>See</u> Tr. at 129:18-130:1 (Eagle, King).

68.     During the interview, Sena stated that the narcotics and firearms were his, and that he intended to go to Santa Fe, New Mexico that day to sell the narcotics to various people who were waiting to purchase the narcotics.  <u>See</u> Tr. at 130:6-10 (Eagle, King).

69.     The agents concluded the interview at the parking lot in the agent's vehicle when they felt that they had enough information.  <u>See</u> Tr. at 131:5-8 (Eagle, King).

70.     Rodriguez transported Diego Sena to the Homeland Security office in Albuquerque, New Mexico.  <u>See</u> Tr. at 105:6-7, 109:9-12 (Rodriguez, Torgoley).

71.     There, agents interviewed Diego Sena a second time, and Diego Sena was "very cooperative and very helpful," identifying "some people" for the HSI agents.  Tr. at 131:17-132:4 (Eagle, King).  <u>See</u> HSI Office Interview Audio Recording at 00:04-1:07:40 (dated July 10, 2023)(United States' Hearing Exhibit 17)(Doc. 43-17)("HSI Office Interview")(Diego Sena,

---

[8]Diego Sena asked the agents what the word waiver meant, and the agents defined it as: "Do you wish to talk to us?"  HSI Vehicle Interview Audio Recording at 2:25-2:30 (Beckford, Diego Sena, King); Tr. at 144:24-145:15 (King, Meyers).

King)[9]; Tr. at 9:13-18 (Court, Spindle)(admitting into evidence United States' exhibits one through seventeen).

72.     A video of the traffic stop was posted on YouTube and social media, which shows Diego Sena expressing cooperation with law enforcement.[10]   See Tr. at 146:20-148:6 (King, Meyers).

73.     The video had been viewed approximately five million times[11] at the time of the suppression hearing on May 10, 2024.  See Tr. at 147:1-8 (King, Meyers).

## PROCEDURAL BACKGROUND

The federal Grand Jury charged Diego Sena with drug trafficking and firearm offenses based on the evidence that Rodriguez found in his car.  See Indictment as to Diego Sena at 1, filed July 26, 2023 (Doc. 12)("Indictment"); Criminal Complaint as to Diego Sena at 1, filed July 11, 2023 (Doc. 1)("Criminal Complaint").  In the MTS, Diego Sena moves the Court on Constitutional grounds to suppress the evidence found during the traffic stop.  See MTS at 1. After the Court orally denied the MTS, Diego Sena moved to Continue Trial and Associated Deadlines.  See Order Granting Unopposed Motion to Continue Trial and Deadlines, filed May 28, 2024 (Doc. 55).

---

[9]The audio recording of this interview at the HSI Office does not identify which agents were present during the interview.  At the hearing, King testified that he could not recall the two other officers who were present for the interview.  See Tr. at 132:5-11 (Eagle, King).  The interview will thus be cited with King and Diego Sena speaking.

[10]It is unclear how the video was leaked to the public, and King testified that he does not know who leaked the video or how it was publicly published.  See Tr. at 146:20-22 (King).

[11]Defense counsel stated the video had been viewed nearly five million times at the time of the hearing, and King confirmed that, when he had checked months earlier in the fall, the video had several million views. See Tr. at 147:1-8 (King, Meyers).

1.      **Procedural History Before the MTS.**

After HSI arrested Diego Sena on July 10, 2023, the United States issued a Criminal Complaint against Diego Sena the following day on July 11, 2023 for two offenses: (i) violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), for possession with intent to distribute 400 grams and more of fentanyl; (ii) violation of 18 U.S.C. §§ 841(a)(1), (b)(1)(B), for possession with intent to distribute a mixture and substance containing heroin. Criminal Complaint at 2. The Grand Jury later indicted Diego Sena on those two charges and a third charge: (i) violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), based on July 10, 2023 conduct, where he knowingly possessed with intent to distribute 400 grams and more of fentanyl; (ii) violation of §§ 841(a)(1), (b)(1)(B), based on July 10, 2023 conduct, where he knowingly possessed with intent to distribute 100 grams and more of heroin; and (iii) violation of 18 U.S.C. § 924(c)(1)(A)(i), based on the July 10, 2023 conduct, where he knowingly possessed a firearm in furtherance of a drug trafficking crime. See Indictment at 2. The Indictment also seeks forfeiture from Diego Sena based on 21 U.S.C. § 841 and 21 U.S.C. § 853 of two firearms, three sets of rounds of ammunition, and two cartridges. See Indictment at 2-3. Diego Sena has pled not guilty. See Clerk's Minute Sheet, filed August 1, 2023 (Doc. 18).

2.      **Diego Sena's MTS.**

Diego Sena filed his MTS on March 11, 2024. See MTS at 1. Diego Sena argues that NMSP violated his Constitutional rights under the Fourth and Fifth Amendments by illegally extending the stop beyond its traffic purpose, searching the trunk without probable cause, and questioning Diego Sena without giving him Miranda warnings. See MTS at 1. Diego Sena additionally argues that Rodriguez' assertion of marijuana odor, which is one of two bases of the probable cause for the trunk's search, was "not reliable." MTS at 6. Diego Sena argues,

- 17 -

therefore, that (i) the Court should suppress evidence that resulted from the search, and (ii) the Court should suppress the statements Diego Sena made in response to the officers' questions while they detained him without <u>Miranda</u> warnings.  <u>See</u> MTS 4-12.

First, Diego Sena argues that Rodriguez did not form reasonable suspicion to prolong the stop beyond its original traffic purpose.  <u>See</u> MTS at 5-6.  Diego Sena argues that, because "the Fourth Amendment prohibits law enforcement officers from unduly delaying traffic stops to investigate other, unrelated crimes," an officer may address only safety concerns or traffic stop's purpose in the absence of reasonable suspicion.  <u>United States v. Lara</u>, WL 2250788, at *1 (10th Cir. 2023)(unpublished)(citing <u>Rodriguez v. United States</u>, 575 U.S. 348 (2015)).  Diego Sena argues that reasonable suspicion forms when an officer has a "'particularized and objective basis for suspecting criminal conduct under a totality of the circumstances.'"  <u>United States v. Cortez</u>, 965 F.3d 827, 834 (10th Cir. 2020)(quoting <u>United States v. Pettit</u>, 785 F.3d 1374, 1379 (10th Cir. 2015)).  Diego Sena argues that, because Rodriguez did not observe any concerning driving behavior and stopped Diego Sena only for a speeding violation, the "non-specific smell of marijuana" is insufficient to form a basis of reasonable suspicion to extend the stop beyond its traffic purpose.  MTS at 5.

Second, Diego Sena argues that Rodriguez' assertion of marijuana smell is "not credible," because he fails to provide sufficient detail about the smell which would allow stakeholders in the criminal justice system to evaluate the contention.  MTS at 6.  Diego Sena asserts that Rodriguez did not question Delores Sena or Diego Sena adequately about how or when she smoked marijuana earlier that day to "substantiate whether that scent could remain."  MTS at 6, n.2.  After asserting the unreliability of the alleged marijuana smell, Diego Sena argues that Rodriguez' compiled reasons for forming reasonable suspicion -- namely, the

improper dealership tag, Diego Sena's nervousness, and the differing travel stories -- do not establish a particularized and objective basis to suspect criminal activity.  See MTS at 7.  Diego Sena argues that his vehicle was not a rental car, like the car in United States v. Lara, WL 2250788, at *1, nor was it reported stolen.  MTS at 7.  Diego Sena also argues that nervousness is of "limited significance in determining reasonable suspicion," because, "[o]f course, everyone gets nervous when stopped by a police officer."  United States v. Ludwig, 641 F.3d 1243, 1249 (10th Cir. 2011).  Diego Sena dismisses Rodriguez' concern about differing travel statements as a mere "word game," arguing that Diego Sena could have interpreted Rodriguez' question to refer only to where they stayed the prior night while Delores Sena could have interpreted the question to refer to her entire vacation.  MTS at 8.  Further, Diego Sena argues that the justification of Phoenix being a narcotics hub is "specious" and "overused" because larger cities typically will be a larger site of criminal activity, and Rodriguez has not provided any statistics about what "percentage of car traffic from Phoenix to New Mexico is drug-related."  MTS at 8.

Diego Sena argues that the sum of Rodriguez' asserted bases for reasonable suspicion do not form the "specific, articulable facts" required for the courts to give deference to law enforcement.  United States v. Frazier, 30 F.4th 1165, 1176 (10th Cir. 2022).  See MTS at 8. Diego Sena also notes that marijuana is legal for recreational use in New Mexico and every state west of it.  See MTS at 7.  Diego Sena asserts that the credibility and reasonableness of the inferences which Rodriguez made are "completely undetermined," and thus Rodriguez "unlawfully prolonged the traffic stop without reasonable suspicion that another crime had occurred."  MTS at 9.  Diego Sena therefore asks the Court to suppress "everything following that unlawful prolongation."  MTS at 9.

Third, Diego Sena argues that Rodriguez lacked probable cause to search Diego Sena's trunk and the trunk's contents.  See MTS at 9.  Citing United States v. Parker, 72 F.3d 1444 (10th Cir. 1995), Diego Sena contends that the Tenth Circuit has established a rule that officers have probable cause to search the passenger compartment only if an officer smells marijuana in the vehicle's passenger compartment.  See 72 F.3d at 1450. See also United States v. Nielsen, 9 F.3d 1487, 1491 (10th Cir. 1993); United States v. Loucks, 806 F.2d 208, 209-10 n.1 (10th Cir. 1986).  Diego Sena argues that to have probable cause to search the trunk, the officer must also find corroborating evidence of the suspected contraband in the passenger compartment.  See United States v. Parker, 72 F.3d at 1450 ("[A]n officer obtains probable cause to search the trunk of a vehicle once he smells marijuana in the passenger compartment and finds corroborating evidence of contraband.").  But see United States v. Nielsen, 9 F.3d at 1491 (finding that no probable cause existed when an "officer [ ] said he smelled *burnt* marijuana," and the court needed "only [to] decide whether that provide[d] probable cause to search a trunk")(emphasis in United States  v. Nielsen).  Diego Sena asserts that, if Rodriguez' smelling marijuana provides probable cause to search the trunk, "a huge swath of law-abiding citizens" who legally shop at N`ew Mexico dispensaries will be subject to an "unjustified infringement on their Fourth Amendment rights."  MTS at 10.

Fourth, Diego Sena argues that Rodriguez unlawfully detained Diego Sena without providing Miranda warnings, so "any statements made after the officer [issued] the traffic warning must be suppressed."  MTS at 10.  Diego Sena argues that, once an officer has returned the driver's documents and issued the citation, a driver is illegally detained[12] if the circumstances

---

[12]Diego Sena conflates the test whether an individual is detained illegally under the Fourth Amendment with the Miranda requirement that an individual not be free to leave for the

cause the driver to believe that he or she cannot leave.  MTS at 11.  See United States v. Shareef, 100 F.3d 1491, 1501 (10th Cir. 1996)("[A]fter an officer issues the citation and returns any materials provided, the driver is illegally detained only if the driver has objectively reasonable cause to believe that he or she is not free to leave.").  Citing Miranda v. Arizona, 384 U.S. 436 (1966), Diego Sena asserts that a suspect's statements are generally inadmissible if law enforcement officers fail to give the suspect a warning and obtain a waiver.  See 384 U.S. at 471-76.[13]  Further, Diego Sena argues that Rodriguez' detention of Diego Sena constitutes a custodial interrogation, because Diego Sena was "not objectively free to leave;" given the following facts: (i) the location of the officer's vehicle, (ii) the statements made "regarding criminal conduct," and (iii) his "failure to be released at the termination of questioning."  MTS at 12.  See Howes v. Fields, 565 U.S. 499, 509 (2023).  For all the above reasons, Diego Sena argues that the evidence seized and statements made after the citation was issued were obtained in violation of the Fourth and Fifth Amendments, and the Court must therefore suppress the evidence and statements.  See MTS at 12.

---

Miranda waiver to be required.  Reasonable suspicion must justify a detention, which constitutes a seizure under the Fourth Amendment, and the detention must be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996).  Separately, whether officers must appraise a defendant of his or her rights under Miranda depends on whether the defendant is in "custody," which is "psychological[ ] rather than physical[ ]." Miranda, 384 U.S. at 448.  Whether a person is in custody is determined primarily by whether a reasonable person would feel free to leave.  See United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)("[T]he extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will often defines the custodial setting.").

[13]Diego Sena cites this proposition with "Miranda v. Arizona, 346 U.S. 344, 48-79 (1966)."  MTS at 12.  No such Miranda v. Arizona case exists, and the general proposition can be found within the pages 448-479 of Miranda v. Arizona 384 U.S. 436 (1966), so the Court has included the correct citation, assuming that Diego Sena's citation is a clerical mistake.

3.      **The United States' Response**.

The United States responds, arguing that the traffic stop is justified Constitutionally and that the Court should not suppress the evidence.   See United States' Response to Defendant's Motion to Suppress Evidence, filed March 25, 2024 (Doc. 42)("Response").   The United States argues that the search is Constitutional, because: (i) Rodriguez had reasonable suspicion that Diego Sena was speeding to begin the traffic stop; (ii) Rodriguez detained Diego Sena after the traffic stop based on probable cause that there was marijuana inside Diego Sena's vehicle, which falls within the motor vehicle exception; (iii) the search of the locked containers in the trunk was within the search's scope; and (iv) the United States does not intend to offer at trial any statements that Diego Sena made before he waived his rights by signing the Miranda Waiver Form.  See Response at 5.

First, the United States asserts that Rodriguez developed reasonable suspicion of additional criminal activity which permitted him to detain Diego Sena after the traffic stop was complete.  See Response at 7-8.  While a traffic stop is limited to actions "reasonably related to the scope of the stop," Response at 5 (citing Rodriguez v. United States, 575 U.S. at 353), traffic stops properly may include inquiries about travel plans without exceeding the scope of a traffic stop, see Response at 6 (citing United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)). The United States argues that an officer may detain a driver for longer than the traffic purpose necessitates if the officer has reasonable suspicion of other criminal activity.  See Response at 6. Paraphrasing United States v. Simpson, 609 F.3d 1140 (10th Cir. 2010), the United States asserts that reasonable suspicion to permit prolonged detention is "determined under an objective consideration of the totality of the circumstances."  Response at 6.  See United States v. Simpson, 609 F.3d at 1146 ("As courts have often repeated, the existence of objectively

reasonable suspicion of illegal activity 'does not depend upon any one factor, but on the totality

of the circumstances.'" (quoting United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993))).

Moreover, the United States contends that the marijuana odor alone can establish probable cause

of search a vehicle and baggage.  See Response at 6; United States v. Morin, 949 F.2d 297, 300

(10th Cir. 1991); United States v. Torres 987 F.3d 893, 903 (10th Cir. 2021)(determining that,

even though the police verified the driver's medical marijuana card, after the police smelled

burnt marijuana upon approaching the vehicle, they had "reasonable suspicion to believe that

[the defendant] or his passenger was violating the federal drug laws' prohibition against the

possession of marijuana").  Dismissing Diego Sena's reliance on Rodriguez v. United States, the

United States asserts that, in that case, the officer had "no suspicion of additional criminal

activity warranting prolonged detention" and extended the traffic stop to waive for a canine to

sniff the vehicle.  Response at 8.  The United States argues that, unlike the officer in Rodriguez

v. United States, Rodriguez had ample suspicion to prolong Diego Sena's detention upon

smelling marijuana and discovering other discrepancies.  See Response at 8.

> The United States argues that once Rodriguez smelled marijuana:
>
> Immediately, the traffic investigation added a narcotics investigation. For approximately the next seven minutes, Officer Rodriguez conducted the typical, routine traffic investigation while building probable cause for a search of the Subaru. In addition to the odor of marijuana, he discovered that Defendant had a marijuana cartridge in his pocket. He observed Defendant acting nervous. He determined that Defendant and the passenger provided inconsistent versions of their recent travel. According to the passenger, they had just returned from a major narcotics hub. Officer Rodriguez had a sufficient basis to continue investigating Defendant after he completed seven minutes of traffic investigation.

Response at 7.  The United States therefore contends that Rodriguez had reasonable suspicion to

prolong the detention after the traffic stop's purpose was complete.  See Response at 8.  Indeed,

the United States argues, by the time Rodriguez completed the traffic stop, he had established

probable cause, a much more difficult burden to meet.  See Response at 7.  See also United States v. Phillips, 71 F.4th 817, 823 (10th Cir. 2023)(holding probable cause existed where officers smelled raw marijuana and stating that officers' "detection of the smell of drugs . . . in a car is entitled to substantial weight in the probable cause analysis and can be an independently sufficient basis for probable cause" (quoting United States v. West, 219 F.3d at 1178)); United States v. Morin, 949 F.2d at 300 ("This court has long recognized that marijuana has a distinct smell and that the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage.").

Second, the United States argues that Rodriguez had probable cause to search the vehicle. See Response at 8. Defining probable cause as "when the facts and circumstances within the officers' knowledge . . . [are] reasonably trustworthy information, [and] are sufficient in themselves to warrant a man of reasonable caution in the believe that an offense has been or is being committed," Patel v. Hall, 849 F.3d 970, 981 (10th Cir. 2017), the United States asserts that the sum of all of the "indica of narcotics trafficking" that Rodriguez noticed constituted "ample cause to search the Subaru," Response at 10.  The United States emphasizes that "the smell of drugs weighs so heavily that it 'can be an independently sufficient basis for probable cause.'"  Response at 9 (quoting United States v. West, 219 F.3d at 1178).  The United States further argues that inconsistencies in travel plans support an officer's determination of probable cause.  See Response at 9 (citing United States v. Cortez, 965 F.3d at 833-37)(concluding that the stop's geography and context, when combined with the drivers' omissions and evasiveness about other passengers, constitute reasonable suspicion of trafficking undocumented individuals).  The United States also notes that the vehicle's search located marijuana and paraphernalia which "confirmed" Rodriguez' detection as "reliable."  Response at 10.

Third, the United States argues that the automobile exception under Carroll v. United States, 267 U.S. 132 (1925) permits Rodriguez' vehicle search and that the search does not exceed a permissible search's scope.  Under the "Carroll Doctrine," the United States asserts, an automobile exception search's permissible scope is equally "thorough as a magistrate could authorize by warrant."  Response at 10 (quoting United States v. Ross, 456 U.S. 798, 800 (1982)).  The United States therefore asserts that both (i) "trunks" and (ii) "locked luggage are well-within the permissible scope of the search."  Response at 10.

The United States asserts that Rodriguez had probable cause to search the trunk under the automobile exception, because: (i) the probable cause was not limited to a particular container, (ii) the marijuana smell was discovered in the suspected container, and (iii) the odor could have been coming from the trunk.  See Response at 11-12.  The United States argues that in United States v. Ross, the Supreme Court establishes that probable cause extends to the entire vehicle, unless the probable cause is limited to a particular container within the vehicle.  See Response at 11.  Compare United States v. Ross, 456 U.S at 814 (holding that probable cause extends to the vehicle's trunk after an informant told police officers that an individual was selling drugs out of a specific vehicle in a specific location), with Arkansas v. Sanders, 442 U.S. 753, 765 (1979)(holding that probable cause is exceeded when officers had probable cause to search a specific container within the vehicle, but, after a fruitless search of the container, officers searched the entire vehicle).[14]  Next, the United States argues that cases where marijuana odor

---

[14]After United States v. Ross, the Supreme Court overruled Arkansas v. Sander in California v. Acevedo. 500 U.S. 565, 573, 580 (1991)(disregarding the Ross/Sanders distinction, because it "provided only minimal protection for privacy and ha[s] impeded effective law enforcement," and holding that "police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained").

establishes probable cause for the passenger compartment and not the trunk turned on whether marijuana ultimately is found in the location in which it was expected to be found.  See Response at 11-12.  The United States also quotes United States v. Nielsen,:

> [W]e have made unqualified statements that the smell of marijuana is sufficient to establish probable cause to search.  In all of the cases in our circuit, however, the search itself established the validity of the smell.  In all of the searches pursuant to the smell, marijuana was found in the area it would be expected to be found.  The case before us is the first in which there was no corroboration of the smell.

9 F.3d at 1491 (footnote omitted).  The United States argues that, because Rodriguez found marijuana and paraphernalia in the trunk, "the validated odor of marijuana or the discovery of contraband is sufficient for probable cause to search the trunk."  Response at 12.  Finally, the United States asserts that, when an odor "could be coming from the trunk," officers are not limited to searches of the passenger compartment.  Response at 12 (citing United States v. Downs, No. 97-10034-01, 1997 WL 624947, at *4 (D. Kan. September 22, 1997)(Marten, J.)("[T]he overpowering smell of raw marijuana in the passenger compartment provides probable cause for searching the trunk if the smell could, in fact, be coming from the trunk."), aff'd, 151 F.3d 1301 (10th Cir. 1998).[15] The United States therefore contends that, because the marijuana smell, which Rodriguez smelled from outside the vehicle once the back windows were lowered, could have been coming from the trunk, "probable cause [ ] extend[s] to the trunk."  Response at 12.  Further, even though Rodriguez "could have" relied on the "odor of marijuana alone," he

---

[15]In affirming the district court's decision, the Tenth Circuit specified the difference between burnt and raw marijuana when establishing the scope of a search: unlike the smell of burnt marijuana, with "the overpowering smell of raw marijuana, there is a fair probability that the car is being used to transport large quantities of marijuana and that the marijuana has been secreted in places other than the passenger compartment." United States v. Downs, 151 F.3d 1301, 1303 (10th Cir. 1998).

also "observed contraband on" Diego Sena and knew about "travel inconsistencies [which] involved a major narcotics hub."  Response at 12.

The United States argues that the Carroll Doctrine also permitted Rodriguez to search the locked bags.  Response at 12.  Because the purpose of the automobile exception "would be largely nullified if the permissible scope of a warrantless search of an automobile did not include containers and packages found inside the vehicle," United States v. Ross specifically "foreclose[d]" distinctions between locked and unlocked containers.  456 U.S. at 822.  The United States thus does not agree with the argument that Rodriguez' search of the locked luggage exceeded the scope of his authority under Carroll Doctrine.

Fourth, and finally, the United States explains that it "does not intend to elicit any statements made by [Diego Sena] from the conclusion of the traffic investigation around 1:00 P.M. until his waiver of Miranda rights at approximately 2:45 P.M."  Response at 14.  Although the United States concedes that once a citation is issued and materials are returned to the driver, a driver is detained, and any interrogation must be prefaced with a waiver of Miranda rights, the United States argues that it is "debatable" whether a reasonable person in Diego Sena's position would have "felt free to leave."  Response at 14 (citing United States v. Shareef, 100 F.3d at 1501).  Because the United States does not intend to rely on any statements that Diego Sena made before he signed the Miranda Waiver Form, it argues that the Court "need not make t[he] determination" whether a reasonable person in Diego Sena's circumstances would have felt free to leave.  Response at 14.

4.      **The May 10, 2024, Suppression Hearing**.

The Court held a hearing on the MTS on May 10, 2024.  See Clerk's Minutes at 1.  At the hearing, Rodriguez and King testified about their version of the events underlying the stop.  See Clerk's Minutes at 1-2.  Diego Sena and the United States reinforced arguments in their briefing.

Largely reiterating the arguments in his brief, Diego Sena argued that, at the moment that Rodriguez "informed Mr. Sena that he would get a written warning," the traffic stop had concluded, and Rodriguez impermissibly prolonged the stop.  Tr. at 155:7-11 (Torgoley).  Diego Sena argues that, because Rodriguez ran the VIN numbers and talked to Delores Sena about her travel plans, which beget the travel inconsistencies, after he told Diego Sena that he would receive a written warning, these actions happened after the "traffic mission was over."  Tr. at 157:11-25 (Torgoley).  Diego Sena contended that, without the travel inconsistency, Rodriguez would not have had probable cause to search the car.  Tr. at 157:22-25 (Torgoley).  Diego Sena asserted that, even if Rodriguez had probable cause to search the car, the probable cause to search the "passenger compartment does not equate to probable cause to search a trunk."  Tr. at 151:23-52:1 (Torgoley).  Citing United States v. Parker, Diego Sena argued that there must be corroboration of the marijuana odor to "lend probable cause to the trunk of a vehicle."   Tr. at 153:14-21 (Torgoley).  Because the marijuana cartridge that Diego Sena produced could not corroborate the smell of marijuana, given that Rodriguez testified that it did not have a smell, there was nothing that "might indicate that there [was] contraband in the trunk of the car."  Tr. at 154:20-55:1 (Torgoley).  Diego Sena argued that United States v. Parker and United States v. Nielsen are not "limited to the smell of burnt marijuana."  Tr. at 158:8-11 (Court, Torgoley).  According to Diego Sena, "[a]t the end of the day, the smell of marijuana that he smelled when the windows went down would imply that the cabin of the vehicle contained marijuana," and that

the trunk did not contain marijuana.  Tr. at 176:12-20 (Torgoley).  Diego Sena expressed concern

that, in States that have legalized marijuana, citizens who are acting lawfully at the State level

are exposed to "warrantless searches" of "everything down to the contents of their luggage."  Tr.

at 177:1-10 (Torgoley).

Beyond the scope of his brief, Diego Sena argued that there is jurisprudence which

"suggests a <u>Miranda</u> waiver . . . could be poisoned by statements made prior to the delivery of

<u>Miranda</u>."  Tr. at 164:1-8 (Torgoley).  Sena asserted that the statements and agreements already

he had made to Rodriguez, before waiving <u>Miranda</u> rights, could have made Diego Sena "more

inclined to waive <u>Miranda</u> when the HSI" agents, and thus the waiver may not have been

"knowing and voluntary."  Tr. at 164:12-16 (Torgoley).[16]

At the hearing, the United States focused much of its argument on the distinction between

the smell of burnt marijuana and raw marijuana.  <u>See</u> Tr. at 166:9-67:13 (Spindle).  The United

States asserted that, because both <u>United States v. Parker</u> and <u>United States v. Nielsen</u> involve

solely the smell of burnt marijuana, the search was limited to the passenger compartment, but

Rodriguez' detection of the raw marijuana odor -- which the trunk's search validated -- permitted

a Constitutional search of the trunk.  <u>See</u> Tr. at 167:3-68:13 (Court, Spindle).  The United States

argued that, when all the factors are aggregated, <u>i.e.</u>, the raw marijuana odor, the travel plan

discrepancies, the marijuana cartridge, Phoenix being a narcotics hub, and the nervousness

(which the United States concedes "shouldn't weigh too heavily"), there is an "abundance of

probable cause."  Tr. at 170:14-71:11 (Spindle).  The United States also objected to Diego Sena's

request for supplemental briefing, because the United States asserts it already had briefed the

---

[16]Although Diego Sena asked for the Court's permission to provide supplemental briefing
on this issue, the Court orally denied the MTS at the hearing, <u>see</u> Tr. at 180:3-6 (Court), and no
briefing was received at the time that the Court filed this Memorandum Opinion and Order.

point.  See Tr. at 172:8-73:8 (Spindle).  Pointing to Oregon v. Elstad, 470 U.S. 298, 318 (1985), the United States argues that, "as long as [the statements] w[eren't] involuntary," the Miranda waiver remains "valid." Tr. at 172:14-24 (Spindle).

The Court indicated that it would allow Diego Sena to provide supplemental briefing if he wished, but denied the MTS.  See Tr. at 180:3-6 (Court). The Court stated that it "found Mr. Rodriguez to be a credible witness" and that, once Rodriguez smelled marijuana, the "Tenth Circuit then allows him to pop the trunk" as a Constitutional investigation.  Tr. at 180:15-23 (Court).   Further, the Court concluded that, because the United States will not offer any statements Diego Sena made prior to his Miranda warnings, "any Miranda issue" in this case would be "eliminate[d]."  Tr. at 180:24-81:3 (Court). The Court therefore denied the MTS.  See Tr. at 181:4 (Court).

## LAW REGARDING FOURTH AMENDMENT SEARCHES AND SEIZURES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.   The hallmark of the Fourth Amendment is reasonableness."      United States v. Harmon,   785  F. Supp.  2d  1146, 1157  (D.N.M.

2011)(Browning, J.).   See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (1978))).   "In the criminal context, reasonableness usually requires a showing of probable cause.   Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)).   The Supreme Court has stated that, in the law enforcement context, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).   See United States v. Ulibarri, No. CR 21-1826 JB, 2024 WL 1113861, at *17 (D.N.M. Mar. 14, 2024)(Browning, J.); United States v. Phongprasert, No. CR 16-0127 JB, 2018 WL 2943242, at *9 (D.N.M. June 12, 2018)(Browning, J.).

      1.    **Reasonable Government Searches**.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.   Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).   See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." (quoting United States v. Knights, 534 U.S. 112, 118 (2001))).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private

interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121.  The

Supreme Court has justified this balancing test with the recognition that "[t]he Fourth

Amendment does not protect all subjective expectations of privacy, but only those that society

recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting

New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

      "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree

to which it intrudes upon an individual's privacy and, on the other, the degree to which it is

needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S.

at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d

1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-

circumstances test as one where 'the reasonableness of a search is determined by assessing, on

the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the

degree to which it is needed for the promotion of legitimate governmental interests'" (quoting

United States v. Knights, 534 U.S. at 119-20)).

        As the text of the Fourth Amendment indicates, the ultimate measure of
the constitutionality of a governmental search is "reasonableness."  At least in a
case . . . where there was no clear practice, either approving or disapproving the
type of search at issue, at the time the constitutional provision was enacted,
whether a particular search meets the reasonableness standard "'is judged by
balancing its intrusion on the individual's Fourth Amendment interests against its
promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor

Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of

reasonableness under the Fourth Amendment is not a concrete test:

        The test of reasonableness under the Fourth Amendment is not capable of precise
definition or mechanical application.  In each case [determining reasonableness]
requires a balancing of the need for the particular search against the invasion of

personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .").

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."  Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring) (quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006))(alteration in Florida v. Jardines, but not in Georgia v. Randolph).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority, noted: "What expectations are legitimate varies, of course, with

context . . . , depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (citing New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)).

>    **2.      Traffic Stops.**

A traffic stop is an investigative detention, see United States v. Toro-Pelaez, 107 F.3d 819, 823 (10th Cir. 1997), and is thus analyzed according to the principles that the Supreme Court set forth in Terry v. Ohio, 392 U.S. 1 (1968)("Terry"), see United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011)(concluding that a traffic stop is a Terry stop); United States v. Leon-Quijada, 107 F.3d 786, 792 (10th Cir. 1997). In Terry, the Supreme Court authorized police officers to conduct limited seizures and to search a person's outer clothing when the officer has reasonable suspicion that criminal activity may be afoot. See Terry, 392 U.S. at 30-31. In the Tenth Circuit, traffic stops are categorized as Terry stops. See United States v. Toro-Pelaez, 107 F.3d at 823-24 ("A traffic stop is a seizure within the meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause."); United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *10 (D.N.M. Feb. 19, 2010)(Browning, J.); United States v. Hanrahan, No. CR 04-1978 JB, 2005 WL 2312746, at *4 (D.N.M. Aug. 12, 2005)(Browning, J.), aff'd, 508 F.3d 962 (10th Cir. 2007).

For officers lawfully to stop a vehicle, they must have "a particularized and objective basis for suspecting the particular persons stopped of criminal activity." United States v. Leos-Quijada, 107 F.3d at 792 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Police officers may stop a vehicle only when they have "a reasonable, articulable suspicion that the

detainee has been, is, or is about to be engaged in criminal activity."  United States v. Elkins, 70

F.3d 81, 83 (10th Cir. 1995)(citing United States v. Nicholson, 983 F.2d 983, 987 (10th Cir.

1993)).  Accord United States v. Ramos, 194 F. Supp. 3d, 1134, 1156 (D.N.M. 2016)(Browning,

J.), aff'd, 723 F. App'x 632 (10th Cir. 2018)(unpublished).   Reasonable suspicion is not

determined by any one factor but by the totality of the circumstances that the officer knows.  See

United States v. Ceballos, 355 F. App'x 226, 229 (10th Cir. 2009)(unpublished); United State v.

Elkins, 70 F.3d at 83 (citing Alabama v. White, 496 U.S. 325, 330 (1990)).   Even if the officer

does not form subjective reasonable suspicion, if the circumstances of which he is aware would

lead an officer to develop reasonable suspicion, the stop is proper.  See United States v. Ceballos,

355 F. App'x at 229 (holding that an officer's "subjective characterization of his actions is

irrelevant").

        If a police officer observes a traffic violation, the officer has cause to execute a traffic

stop.  See Wren v. United States, 517 U.S. 806, 809-10 (1996)("As a general matter, the

decision to stop an automobile is reasonable where the police have probable cause to believe that

a traffic violation has occurred."); United States v. Ramstad, 308 F.3d 1139, 1144 & n. 1 (10th

Cir. 2002)(acknowledging that Wren v. United States "indicate[s] that probable cause is a

*sufficient* ground for a stop," but explaining that reasonable suspicion is all that is necessary

(quoting United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001)(emphasis in United

States v. Ramstad and in United States v. Callarman)).   Even if the officer has an ulterior motive

for executing the traffic stop -- i.e., to investigate some other suspected illegal conduct -- the

officer lawfully can stop a vehicle that he or she observes violating the traffic laws.  See Wren

v. United States, 517 U.S. at 813-14; United States v. King, 209 F. App'x 760, 762 (10th Cir.

2006)(unpublished)("The constitutional reasonableness of a traffic stop does not depend on the

- 35 -

actual motivations of the officer involved.")(citing <u>Whren v. United States</u>, 517 U.S. at 813).   In other words, there is no Constitutional prohibition on what are colloquially called "pretext stops," so long as the officer also has a constitutional basis for executing the stop.   <u>United States v. Sedillo</u>, 2010 WL 965743, at *10.

"A seizure for a traffic violation justifies a police investigation of that violation." <u>Rodriguez v. United States</u>, 575 U.S. at 354.   <u>See</u> <u>Knowles v. Iowa</u>, 525 U.S. 113, 117 (1998)(observing that the investigation into the traffic offense is "a relatively brief encounter" that is "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest")(quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984)).   The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop, . . . and attend to related safety concerns."   <u>Rodriguez v. United States</u>, 575 U.S. at 354.   "[O]fficers may not 'divert from the mission of the stop in order to conduct general criminal interdiction or investigate other crimes.'" <u>United States v. Cates</u>, 73 F.4th 795, 805 (10th Cir. 2023)(quoting <u>United States v. Cortez</u>, 965 F.3d 827, 838 (10th Cir. 2020)), <u>cert. denied</u>, 144 S. Ct. 1033 (2024).

Because the officer's purpose is to address the traffic infraction, the stop may last no longer than is necessary to effectuate that purpose.   <u>See</u> <u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005).   The authority for the seizure therefore ends when the officer completes -- "or reasonably should have [] completed" -- the tasks tied to the traffic infraction.   <u>Rodriguez v. United States</u>, 575 U.S. at 354.   <u>See</u> <u>United States v. Hunnicutt</u>, 135 F.3d 1345, 1349 (10th Cir. 1998)(observing that the traffic stop must last no longer than necessary to confirm or deny the suspicion that justified the stop -- the traffic offense); <u>United States v. Ramos</u>, 194 F. Supp. 3d at 1157.   In short, absent reasonable suspicion to justify an extended detention, an officer cannot

"measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries.  Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)).

Beyond writing the traffic citation, an officer's mission includes "ordinary inquiries incident to [the traffic] stop."  Illinois v. Caballes, 543 U.S. at 408.  Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding warrants for the driver exist.  See Delaware v. Prouse, 440 U.S. 648, 658-60 (1979).  These checks serve the same purpose as the traffic code: to ensure that vehicles on the road are operated safely and responsibly.  See Delaware v. Prouse, 440 U.S. at 658-59; 4 W. LaFave, Search and Seizure § 9.3(c), 507-517 (5th ed. 2012).  Similarly, a VIN inspection confirms that the driver legally can operate this particular vehicle -- because it is not stolen -- on the highway.  See New York v. Class, 475 U.S. 106, 115 (1986)(concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop").  The Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations."  New York v. Class, 475 U.S. at 119.  See id. at 114 ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile.").  Unlike checking license and insurance, however, checking the VIN located inside of the vehicle's doorjamb requires opening the vehicle's door.  Nonetheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- is subject to a reasonable expectation of privacy.  New York v. Class, 475 U.S. at

118.   Checking a vehicle's VIN therefore has a similarly close connection to roadway safety as the ordinary inquiries, so it can fairly be characterized as part of the officer's traffic mission. In addition to checking a VIN, an officer may require a defendant to produce a rental agreement without diverting from the traffic mission.  See United States v. Dawson, 90 F.4th 1286, 1292 (10th Cir. 2024).  "[A]kin to inspecting a privately-owned vehicle's registration," checking a rental agreement did not divert from the traffic mission and therefore did not require separate reasonable suspicion from the officer's original purpose for the traffic stop.  United States v. Dawson, 90 F.4th at 1292.

Officers also may engage in routine questioning while conducting the traffic stop but "only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. at 327-28). See Muehler v. Mena, 544 U.S. 93, 101 (2005)(noting that, because unrelated inquiries did not "exten[d] the time [the petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required").  Accordingly, an officer may conduct certain unrelated checks during a lawful traffic stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  Rodriguez v. United States, 575 U.S. at 355.

In Rodriguez v. United States, the Supreme Court held that a "seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation."  575 U.S. at 350-51 (quoting Illinois v. Caballes, 543 U.S. at 407)(alterations in Rodriguez v. United States).  There, a police officer issued a driver a traffic warning, and returned to the driver and to the passenger all of their documents.  See 575 U.S. at 351-52.  After "the justification for the

traffic stop was 'out of the way'" and without permission from the driver, the officer: (i) instructed the driver to turn off the ignition, exit the vehicle, and stand by the patrol car; and (ii) deployed a K-9 to circle the vehicle twice to sniff for drugs.  575 U.S. at 352.  "[S]even or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs."  575 U.S. at 352.  The Supreme Court rejected the United States Court of Appeals for the Eighth Circuit's conclusion that the seven- or eight-minute delay constituted an acceptable "*de minimis* intrusion on Rodriguez's personal liberty."  575 U.S. at 353.  The Supreme Court concluded that the dog sniff, if performed without reasonable suspicion, measurably extended the detention and noted that the officer's authority to detain the driver "end[ed] when tasks tied to the traffic infraction are -- or reasonably should have been -- completed."  Rodriguez v. United States, 575 U.S. at 354.  See United States v. Sharpe, 470 U.S. 675, 686 (1985)(stating that, in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation")(alterations added).  A "Rodriguez moment" occurs at the time an officer's investigation diverges from the traffic purpose.  See United States v. Batara-Molina, 60 F.4th 1251, 1255 n.1 (10th Cir. 2023)("This moment that the stop is prolonged such that reasonable suspicion was necessary is referred to as the 'Rodriguez moment.'").

The Terry v. Ohio framework applies whether the traffic stop is based on reasonable suspicion or probable cause.  See United States v. Holt, 264 F.3d 1215, 1230 (10th Cir 2005), overruled on other grounds as recognized in United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007).  "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. at 403), courts assess the reasonableness of a routine traffic stop under the principles laid out for

investigative detentions in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." <u>United States v. Wilson</u>, 96 F. App'x 640, 643 (10th Cir. 2004)(unpublished)(quoting <u>United States v. Holt</u>, 264 F.3d at 1220). A court must examine "both the length of the detention and the manner in which it is carried out," <u>United States v. Holt</u>, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" <u>United States v. Wilson</u>, 96 F. App'x at 643 (quoting <u>United States v. Caro</u>, 248 F.3d 1240, 1244 (10th Cir. 2001)). "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification.'" <u>United States v. Wilson</u>, 96 F. App'x at 644 (alterations in original)(quoting <u>United States v. Wood</u>, 106 F.3d 942, 945 (10th Cir. 1997)). "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." <u>United States v. Winder</u>, 557 F.3d at 1134.

The Tenth Circuit suggested an outer bound of reasonable suspicion in one "close case," finding no reasonable suspicion to extend the traffic stop when an officer's basis at the "<u>Rodriguez</u> moment" was, as the district court described it,

> [t]he potential origin of the trip from Arizona, which is known to be a drug hub; traveling from that destination to Minnesota; vague travel plans; unsure how long he was going to be in Denver; vague reasons for even being in Denver; attempting to control the conversation; inconsistent statements regarding where he was currently living; the Arizona driver's license; the Minnesota registered vehicle; the

condition of the interior of the vehicle; and Mr. Leon's nervousness . . .

United States v. Leon, 80 F.4th 1160, 1170, 1165 (10th Cir. 2023)(quoting record on appeal). Although "reasonable suspicion is a low bar, '[t]he articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied,'" and the officer's "suspicion was inchoate rather than reasonable." United States v. Leon, 80 F.4th at 1170 (quoting United States v. Neff, 681 F.3d 1134, 1142 (10th Cir. 2012)). The suspicion in United States v. Leon was unreasonable, in part, because the "characterization of Arizona and Minnesota as drug hubs . . . add[ed] nothing to the reasonable suspicion calculus." United States v. Leon, 80 F.4th at 1166. See United States v. Guerrero, 472 F.3d 784, 787–88 (10th Cir. 2007)(concluding that the defendant traveling from drug source area did "little to add to the overall calculus of suspicion"). Further, the defendant's travel plans were "at most unusual, not logistically unrealistic"; the defendant never offered inconsistent statements about where he lived; the "condition of the vehicle's interior" added "no weight" to reasonable suspicion; and the defendant "exhibited no physical manifestations of extreme nervousness." United States v. Leon, 80 F.4th at 1166-68. Measured as the cumulation of factors at the "Rodriguez moment," the Tenth Circuit found that the factors did not "operate together to eliminate a sufficient portion of innocent travel." United States v. Leon, 80 F.4th at 1170. But see United States v. Batara-Molina, 60 F.4th 1251, 1259 (10th Cir. 2023)(finding that a "cover odor," a third-party rental, and the details of the rental agreement were "right on the line," but ultimately sufficient to establish reasonable suspicion, because of the deference given to officers to determine whether actions are innocent or suspicious); United States v. Ramos, 194 F. Supp. 3d at 1173 (Browning, J.)(concluding that a passenger who was acting "very distracted" and nervous contributed to an officer's reasonable suspicion), aff'd, 723 F. App'x 632 (10th Cir.

2018)(unpublished); <u>United States v. Torres</u>, No. CR 16-4138 JB, 2017 WL 3149395, at *28 (D.N.M. June 9, 2017)(including the defendant's nervousness and an "overpowering smell of air freshener" in the factors contributing to the officer's reasonable suspicion), <u>aff'd</u>, 786 F. App'x 726 (10th Cir. 2019)(unpublished).

### 3.   **Vehicle Searches.**

While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, <u>see</u> <u>United States v. Toro-Pelaez</u>, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, <u>see</u> <u>United States v. Forbes</u>, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").   Under the automobile-exception to the warrant requirement, however, a warrant is generally not required.   See <u>Carroll v. United States</u>, 267 U.S. 132, 153 (1925)(establishing the automobile exception for vehicles, "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought" unlike "a store, dwelling house, or other structure").   The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle.   See <u>Maryland v. Dyson</u>, 527 U.S. 465, 467 (1999)("[W]here there [is] probable cause to search a vehicle[,] 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained.*'")(citing <u>United States v. Ross</u>, 456 U.S. at 809)(emphasis added in <u>Maryland v. Dyson</u>); <u>California v. Carney</u>, 471 U.S. 386, 393 (1985)(applying the automobile exception to the defendant's mobile home, because it was "readily mobile" and "could readily have been moved beyond the reach of the police");

Collins v. Virginia, 584 U.S. 586, 596 (2018)(declining to apply the automobile exception to a motorcycle parked in the curtilage of a house, because such a search "would unmoor the exception from its justification" that a vehicle poses a risk of immediate mobility). Thus, if the vehicle is readily mobile, "probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." United States v. Phillips, 71 F.4th 817, 823 (10th Cir. 2023)(quoting United States v. Vasquez-Castillo, 258 F.3d 1207, 1212 (10th Cir. 2001)).

## LAW REGARDING MIRANDA RIGHTS

Law enforcement officials must give the Miranda warnings to a person subject to "'custodial interrogation.'" United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(quoting Miranda, 384 U.S. at 444). A person is in custody if "'his freedom of action is curtailed to a degree associated with formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). The court must examine "whether 'a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (alterations in original)(quoting Berkemer v. McCarty, 468 U.S. at 442).

### 1.    Custodial Interrogation.

A suspect cannot invoke his Miranda rights anticipatorily; Miranda's protections do not trigger until the suspect is in a custodial interrogation context. See McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991). See also Appleby v. Cline, 711 F. App'x 459, 464 (10th Cir. 2017)(unpublished); United States v. Cook, 599 F.3d 1208, 1214 (10th Cir. 2010)("[I]n

order to implicate *Miranda* and *Edwards*,[17] there must be a custodial interrogation."). "'By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Berkemer v. McCarty, 468 U.S. at 428 (quoting Miranda, 384 U.S. at 444). There are "'[t]wo discrete inquiries . . . essential to the determination'" of custody: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011)(quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)(internal quotation marks, alteration, and footnote omitted by J.D.B. v. North Carolina)). See United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998). "'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" J.D.B. v. North Carolina, 564 U.S. at 270 (quoting Thompson v. Keohane, 516 U.S. at 112 (internal quotation marks, alteration, and footnote omitted in J.D.B. v. North Carolina)). A suspect's Miranda rights, such as a suspect's right to counsel, may trigger before a law-enforcement officer gives a Miranda warning. See United States v. Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998).

The Tenth Circuit -- recognizing that a determination whether the totality of circumstances make an interrogation "custodial" is fact intensive -- has instructed district courts to consider several non-exhaustive factors in determining whether a custodial interrogation took

_____

[17]Edwards v. Arizona, 451 U.S. 477 (1981), held that, once an individual expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85.

place.  See United States v. Jones, 523 F.3d 1235, 1240 (10th Cir. 2008).  Those factors include:
(i) whether the suspect is informed that he or she may end the interview at will or is not required
to answer questions; (ii) whether the interview's nature is likely to create a coercive environment
from which a suspect would not feel free to leave, such as where there is prolonged accusatory
questioning; and (iii) whether the police dominate the encounter with the suspect.  See United
States v. Jones, 523 F.3d at 1240 (citing United States v. Griffin, 7 F.3d 1512, 1518
(10th Cir. 1993)).  Several factors indicate police domination of the encounter: (i) separating the
suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic
questioning rooms; (iii) multiple officers' threatening presence; (iv) an officer displaying
weapons; (v) physical contact with the suspect; and (vi) use of language or vocal tones which
suggest that compliance with an officer's request is compulsory.  See United States v. Jones, 523
F.3d at 1240.  The Tenth Circuit has been deliberate in emphasizing, however, that courts must
consider the circumstances surrounding the police-citizen encounter as a whole rather than
exclusively relying on some enumerated factors while ignoring others.  See United States v.
Jones, 523 F.3d at 1240.

What amounts to custody, however, is only half of the inquiry.  See United States v.
Cash, 733 F.3d 1264, 1277 (10th Cir. 2013)("'The fact that [a defendant is] in custody,'
however, 'does not automatically render [an] exchange an interrogation.'"  (alterations in United
States v. Cash)(quoting Fox v. Ward, 200 F.3d 1286, 1298 (10th Cir. 2000)).  A suspect in
custody may not invoke his Miranda rights if he is not also interrogated.  See Rhode Island v.
Innis, 446 U.S. 291, 293, 300 (1980).  Interrogation does not require "express questioning of a
defendant while in custody."  Rhode Island v. Innis, 446 U.S. at 298-99.  The Supreme Court
explains that Miranda is concerned with more than just questioning, but also the "'interrogation

environment,'" which implicates practices that "did not involve express questioning." Rhode

Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 458).  "For example, one of the

practices discussed in *Miranda* was the use of line-ups in which a coached witness would pick

the defendant as the perpetrator.  This was designed to establish that the defendant was in fact

guilty as a predicate for further interrogation."  Rhode Island v. Innis, 446 U.S. at 299 (citing

Miranda, 384 U.S. at 453).

> A variation on this theme discussed in *Miranda* was the so-called "reverse line-up"
> in which a defendant would be identified by coached witnesses as the perpetrator of
> a fictitious crime, with the object of inducing him to confess to the actual crime of
> which he was suspected in order to escape the false prosecution.

Rhode Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 453).  Accordingly, "the

term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words

or actions on the part of the police (other than those normally attendant to arrest and custody)

that the police should know are reasonably likely to elicit an incriminating response from the

suspect." Rhode Island v. Innis, 446 U.S. at 301 (quoting Miranda, 384 U.S at 439).  See United

States v. Cash, 733 F.3d at 1277 ("[I]nterrogation extends *only* to words or actions that the

officers should have known were reasonably likely to elicit an incriminating response."

(emphasis added in United States v. Cash)(quoting Fox v. Ward, 200 F.3d at 1298)). "The latter

portion of this definition focuses primarily upon the perceptions of the suspect, rather than the

intent of the police."  Rhode Island v. Innis, 446 U.S. at 301.  See United States v. Yepa, 862

F.3d 1252, 1257 (10th Cir. 2017).

"[C]onduct 'normally attendant to arrest and custody'" is "not the 'functional equivalent'

of interrogation."  Fox v. Ward, 200 F.3d at 1298 (quoting Rhode Island v. Innis, 446 U.S. at

301(concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their

business cards did not constitute interrogation).  The Tenth Circuit has concluded, however, that interrogation "includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent."  United States v. Bautista, 145 F.3d at 1147 n.3 (citing United States v. Kelsey, 951 F.2d 1196, 1199 (10th Cir. 1991)("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")).  See Connecticut v. Barrett, 479 U.S. 523, 531 (1987)("[C]ustodial interrogation is inherently coercive and . . . a defendant must receive detailed warnings that he or she has the rights to remain silent to receive assistance of counsel before and during questioning.").

The Tenth Circuit, however, has since walked back from United States v. Bautista and United States v. Kelsey.  In United States v. Cash, a suspect was handcuffed and placed in the back of a squad car after a scuffle with the police, but that did not amount to an interrogation -- even though questioning was imminent.  733 F.3d at 1278-79.  Rather, the Tenth Circuit focused its inquiry on specific exchanges between the suspect and the officers to determine whether the officer's questions were "'reasonably likely to elicit an incriminating response'" as Rhode Island v. Innis instructs.  United States v. Cash, 733 F.3d at 1278-79 (quoting Rhode Island v. Innis, 446 U.S. at 301).  See United States v. Yepa, 862 F.3d at 1258-61; United States v. Benard, 680 F.3d 1206, 1212 (10th Cir. 2012).

The Court has considered custodial interrogation on several occasions.  In United States v. Romero, 743 F. Supp. 2d 1281 (D.N.M. 2010)(Browning, J.), aff'd on other grounds, 749 F.3d 900 (10th Cir. 2014), the Court applies to Rhode Island v. Innis and concludes that a suspect is subjected to interrogation, but is not in custody, so Miranda does not apply.  See 743 F. Supp. 2d at 1332.  The Court determines that a suspect is interrogated, because officers asked the suspect

about his whereabouts on a Friday night, and the officer knew that the suspect was the last person to see the victim alive on Friday.  See United States v. Romero, 743 F. Supp. 2d at 1332. The Court concludes, however, that the suspect is not in custody, because there iss "nothing excessively coercive . . . about the circumstances of the questioning."  743 F. Supp. 2d at 1334. The suspect sat in a police vehicle while questioned, but: (i) he sat in the front seat; (ii) the car's back door was open, suggesting informality;  (iii) both windows were rolled down, also suggesting informality and indicating that the suspect was not in a non-public questioning room; (iv) there was no prolonged accusatory questioning; (v) the suspect was not taken to a police station; (vi) law enforcement officers did not display their weapons; and (vii) the officers never touched the suspect.  See 743 F. Supp. 2d at 1334-35.  See also United States v. Young, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018)(Browning, J.)(stating that a defendant in handcuffs is in custody, but that no interrogation occurs when the officer does not ask the defendant any questions reasonably likely to elicit an incriminating response); United States v. Begay, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018)(Browning, J.)(concluding that the questioning constitutes an interrogation, but that the interrogation is not custodial, because, even though the police dominate the interrogation by isolating the defendant in the police vehicle with multiple officers and with at least one visible firearm, the defendant is told that he can stop the interview if he wants or not answer a question, and the questioning is not "prolonged" or "accusatory"); id. at 1362-63 (concluding that, in a second interview at an FBI office which the defendant attended "unexpectedly and without an appointment," the defendant is not in custody, because the law enforcement officers (i) tell the defendant he does not have to answer questions if he does not want to, (ii) "engage[ ] in little questioning," instead "allow[ing] [the defendant] to speak at length," and (iii) does not dominate the questioning); United States v. Fox, No. CR 05-0772 JB,

2006 WL 4017485, at *10-11 (D.N.M. Oct. 29, 2006)(Browning, J.)(explaining that no Fifth Amendment violation occurs where the defendant is advised of his rights, makes the incriminating statements after making his telephone call, admits that he received no pressure to waive his rights, and is not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(deeming no Fifth Amendment violation where police interview the defendant in surroundings familiar to him, inform him of his rights, engage in no coercive conduct, and give the defendant a choice to speak with them and sign an advice of rights form).

### 2.    Miranda Waiver.

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently." United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008)(quoting United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)). An express statement is not required; the waiver can be inferred from the defendant's actions and words. See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir. 2006)(citing United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997)). "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" United States v. Burson, 531 F.3d at 1256 (quoting Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006)). The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurs. See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11. The Tenth Circuit notes that this standard incorporates two distinct requirements:

> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made

with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)).  In determining whether a waiver of rights is knowing and intelligent, the Tenth Circuit employs a totality of the circumstances approach.  See United States v. Burson, 531 F.3d at 1256-57 (citing Colorado v. Spring, 479 U.S. at 573).  "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect."  United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010)(citing Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004); United States v. Minjares-Alvarez, 264 F.3d 980, 985 (10th Cir. 2001)).  A "state of intoxication does not automatically render a statement involuntary."  United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993).  "Rather the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.'"  United States v. Smith, 606 F.3d at 1276-77 (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)("Dickerson")(alterations in United States v. Smith, but not in Dickerson v. United States)).

In United States v. Tafoya, 399 F. Supp. 2d 1227 (D.N.M. 2005)(Browning, J.), the Court considered whether a suspect knowingly waives his Miranda rights after he is given the warning and responds to the officer's questioning related to the investigation.  See 399 F. Supp. 2d at 1238.  Although the suspect was "emotional" during the questioning, he "gave clear and appropriate answers" to the questions asked of him.  399 F. Supp. 2d at 1238-39.  On those facts,

the Court concludes that the suspect had "made voluntary" statements.  399 F. Supp. 2d at 1239.

See   United States v. Begay,   310   F.   Supp.   3d   1318,   1364-65   (D.N.M.

2018)(Browning, J.)(concluding that the defendant voluntarily waives Miranda rights during an

interrogation).

### 3.      **Requests for an Attorney.**

The Fifth and Fourteenth Amendments to the Constitution of the United States of

America provide the accused a "right to have counsel present during custodial interrogation."

Edwards v. Arizona, 451 U.S. at 482.  In Miranda, the Supreme Court held:

> If the individual states that he wants an attorney, the interrogation must cease until
> an attorney is present.  At that time, the individual must have an opportunity to
> confer with the attorney and to have him present during any subsequent
> questioning.  If the individual cannot obtain an attorney and he indicates that he
> wants one before speaking to police, they must respect his decision to remain
> silent.

384 U.S. at 474.   The Supreme Court expanded on that principle in Edwards v. Arizona,

concluding that, once an individual, subject to custodial interrogation, expresses a desire for

counsel, that individual is "not subject to further interrogation by the authorities until counsel has

been made available to him, unless the accused himself initiates further communication,

exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. at 484-85.  See

Davis v. United States, 512 U.S. 452, 458 (1994)("[I]f a suspect requests counsel at any time

during the interview, he is not subject to further questioning until a lawyer has been made

available or the suspect himself reinitiates conversation."); Edwards v. Arizona, 451 U.S. at 485

("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth

Amendments would prohibit the police from merely listening to his voluntary, volunteered

statements and using them against him at trial."). The Tenth Circuit has held that Edwards v.

Arizona applies -- and a suspect can invoke a right to counsel -- before the officers have issued a Miranda warning.  See United States v. Kelsey, 951 F.2d at 1199 ("It is clear from the exchange between Kelsey and the police . . . that the police intended to question Kelsey at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning.").

      4.      **Midstream Miranda Warnings.**

The Supreme Court first considered midstream Miranda warnings in Oregon v. Elstad, 470 U.S. 298 (1985)("Elstad"), a home-burglary case.  In Elstad, a witness to the burglary implicated an eighteen-year-old neighbor -- Michael Elstad -- and, on that information, State of Oregon detectives confronted the teenager in his parents' home.  See 470 U.S. at 300.  Without issuing a Miranda warning, detectives briefly questioned Elstad in his parents' living room, and Elstad admitted that he was involved in the burglary.  See 470 U.S. at 301.  The detectives then escorted Elstad to the sheriff's headquarters and read him his Miranda rights.  See 470 U.S. at 301.  Elstad waived them and gave a full written confession.  See 470 U.S. at 301-02.

On appeal, Elstad argued that his "confession was tainted by the earlier failure of the police to provide *Miranda* warnings," Elstad, 470 U.S. at 305, and, drawing on the Fourth Amendment's fruit-of-the-poisonous-tree doctrine, see Wong Sun v. United States, 371 U.S. 471 (1963), he contended that the confession "must be excluded," Elstad, 470 U.S. at 305.  The Supreme Court disagreed with Elstad, concluding that "procedural *Miranda* violation[s] differ[] in significant respects from" Fourth Amendment violations.  Elstad, 470 U.S. at 306 (alterations added).  It explained that, unlike a Fourth Amendment search-and-seizure violation, a Miranda violation does not necessarily mean that there was a Constitutional violation.  See Elstad, 470 U.S. at 306-07.  The Fifth Amendment prohibits the use of compelled testimony; "[f]ailure to

administer *Miranda* warnings," on the other hand, "creates a presumption of compulsion," but "unwarned statements that are otherwise voluntary" nevertheless are barred under *Miranda*. *Elstad*, 470 U.S. at 306-07. Thus, the "*Miranda* exclusionary rule" is prophylactic and "sweeps more broadly than the Fifth Amendment itself." *Elstad*, 470 U.S. at 307.

That *Miranda* sweeps more broadly than the Fifth Amendment means that, unlike a Fourth Amendment violation, a *Miranda* violation does not necessarily require a confession's exclusion.[18] *See* 470 U.S. at 307; *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348 (2006)("We

---

[18]There is tension in this reasoning and with the Supreme Court's later determination in *Dickerson*, 530 U.S. 428 (2000)("*Dickerson*"), that *Miranda* is a constitutional rule. *See* 530 U.S. at 437-38, 441. In *Dickerson*, although conceding that "we have repeatedly referred to the *Miranda* warnings as 'prophylactic,' and 'not themselves rights protected by the Constitution,'" *Dickerson*, 530 U.S. at 437-38 (quoting *New York v. Quarles*, 467 U.S. 649, 653 (1984); *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)), the Supreme Court concludes that "*Miranda* is a constitutional decision," because (i) it had consistently applied *Miranda* to State court decisions and (ii) *Miranda* has invited legislative action "to protect the constitutional right against coerced self-incrimination," *Dickerson*, 530 U.S. at 438-40. If *Miranda* is a Constitutional rule, however, it is hard to see how it can "sweep[] more broadly than the Fifth Amendment itself." *Elstad*, 470 U.S. at 306. It is possible that the Supreme Court meant that *Miranda* implicated additional Constitutional amendments, such as the Fourteenth, but the statement's context in *Elstad* suggests that the Supreme Court meant that *Miranda*'s exclusionary rule arose from judicial rulemaking, and not from some other Amendment beyond the Fifth. *See Elstad*, 470 U.S. at 305; *id.* at 307 ("*Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm."). The Supreme Court, in expressly recognizing this tension, notes that *Elstad* "does not prove that *Miranda* is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." *Dickerson*, 530 U.S. at 441. But *see Dickerson*, 530 U.S. at 454 (Scalia, J., dissenting)("The proposition that failure to comply with *Miranda*'s rules does not establish a constitutional violation was central to the *holdings* of [*Michigan v.*] *Tucker*, [530 U.S. 428 (2000)], [*Oregon v.*] *Hass*, [420 U.S. 714 (1975)], [*New York v.*] *Quarles*, [467 U.S. 649 (1984)], and *Elstad*.")(emphasis in original)(alterations added). Because *Elstad*'s reasoning to exclude fruit-of-the-poisonous-tree evidence rests, in large part, on *Miranda* being a nonconstitutional rule, *Dickerson*'s determination that *Miranda* is a Constitutional rule reopens the question why fruit-of-the-poisonous-tree evidence is not excluded after a procedurally tainted *Miranda* warning. *See United States v. Patane*, 542 U.S. 630, 636 (2004)("*Patane*")(plurality op.)("Based on its understanding of *Dickerson*, the Court of Appeals rejected the post-*Dickerson* views of the Third and Fourth Circuits that the fruits doctrine does

have applied the exclusionary rule primarily to deter constitutional violations.").  Indeed, the

_____

not apply to *Miranda* violations.").  See also Sanchez-Llamas v. Oregon, 548 U.S. at 348 ("We have applied the exclusionary rule primarily to deter constitutional violations.").

The Supreme Court attempts to resolve this tension in Patane, but a divided court did not produce a controlling opinion.  See Patane, 542 U.S. at 635-36.  The Honorable Antonin G. Scalia, then-Associate Justice of the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, and the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, determined that Miranda is a prophylactic rule and that admitting "fruits" evidence from a voluntary statement does not implicate the Fifth Amendment's self-incrimination clause.  Patane, 542 U.S. at 636.  The plurality reasons that, even taking Dickerson's holding to heart that Miranda is a Constitutional rule, there must be a close fit between the Constitutional violation and the remedy.  See Patane, 542 U.S. at 643.  It concludes that admitting nontestimonial fruits of a voluntary statement do not implicate the self-incrimination clause, so there is no fit between the Miranda violation and the exclusionary remedy.  See Patane, 542 U.S. at 643 ("The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial.").  In so concluding, the three Justices in the plurality reaffirmed that Elstad's reasoning is sound.  Patane, 542 U.S. at 639-40.  The Honorable Sandra Day O'Connor and the Honorable Anthony M. Kennedy, then-Associate Justices of the Supreme Court, concur in the judgment and agree that Elstad is still good law after Dickerson.  See Patane, 542 U.S. at 645 (Kennedy, J., concurring).  The two Justices did not, however, adopt expressly the Constitutional "fit" analysis that the plurality deploy.  Patane, 542 U.S. at 645.  They concluded that admitting nontestimonal fruits from a voluntary statement "does not run the risk of admitting into trial an accused's coerced incriminating statements against himself."  Patane, 542 U.S. at 645 (Kennedy, J., concurring).  Instead of concluding that such a remedy does not fit the Constitutional violation, however, they conclude that excluding such evidence does not serve the police "deterrence rationale" infusing Miranda.  Patane, 542 U.S. at 645 (Kennedy, J., concurring).  The concurrence does not comment on Elstad's rationale that Miranda does not justify excluding "fruits" evidence, because, unlike the Fourth Amendment, Miranda is not a Constitutional rule.

Elstad's Constitutional reasoning, thus, may no longer be good law, but its trustworthiness and deterrence rationales may be.  See Elstad, 470 U.S. at 308.  Moreover, despite Dickerson's suggestion that "fruits" evidence may need to be excluded as Miranda is a Constitutional rule, five Justices eschewed that suggestion in Patane.  Patane, 542 U.S. at 643, 645.  Accordingly, the Court concludes that a procedural Miranda violation does not require the Court to exclude nontestimonal evidence from a voluntary statement based on a fruit-of-the-poisonous-tree theory.  See Wong Sun v. United States, 371 U.S. at 471; United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006).

Furthermore, the Court would join the Justices who have noted that Miranda is not properly rooted or found in the Constitution, but instead is the product of the Supreme Court's power to provide prophylactic rules.  See Maryland v. Shatzer, 559 U.S. at 106.  It may not be a bad rule in that it has -- with its bright-line application -- made a lot of otherwise fuzzy confessions valuable and protected police in their work, but its Constitutional and judicial underpinnings are shaky if not non-existent.

prosecution still may use for impeachment purposes a confession obtained in violation of Miranda.  See Elstad, 470 U.S. at 307.  Moreover, the Supreme Court reasons that categorically barring a confession after a midstream Miranda warning "undercuts the twin rationales" of the prophylactic Miranda rule -- trustworthiness and deterrence.  Elstad, 470 U.S. at 308.  See Dickerson, 530 U.S. at 433 ("The roots of this test developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy.").

> "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt . . . but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given to it; and therefore it is rejected."

Dickerson, 530 U.S. at 433 (quoting King v. Warickshall, 1 Leach 262, 263-64, 168 Eng. Rep. 234, 235 (K.B. 1783)).  If the post-Miranda confession is otherwise knowing and voluntary, its trustworthiness is not in doubt.  See Elstad, 470 U.S. at 308.  The deterrence rationale likewise loses force when the officers act in good faith compliance with Miranda.  See Elstad, 470 U.S. at 308 (citing Michigan v. Tucker, 417 U.S. 433, 447-48 (1974)).  Accordingly, the Supreme Court holds that, once the Miranda warning is made, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made."  Elstad, 470 U.S. at 309.  See Elstad, 470 U.S. at 318 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made.  As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.").

Extrapolating from that test, the Supreme Court concludes that Elstad's pre- and post-Miranda confessions are voluntary and therefore admissible.  See Elstad, 470 U.S. at 314-15.  It

notes that, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." Elstad, 470 U.S. at 310. Where, however, the initial confession is voluntary, "a break in the stream of events" is not needed for the second confession to be admissible. Elstad, 470 U.S. at 310. Rather, the Miranda warning "serves to cure the condition that rendered the unwarned statement inadmissible." Elstad, 470 U.S. at 311.

In Elstad, the Supreme Court reasons that the initial confession "took place at midday" in Elstad's living room with his mother "a few steps away," so it was voluntary. Elstad, 470 U.S. at 315. With no additional facts demonstrating that the second confession, post-Miranda is elicited under coercive conditions, the Supreme Court deems it admissible. See Elstad, 470 U.S. at 314. That Elstad had "'let the cat out of the bag by confessing'" with his first statement, Elstad, 470 U.S. at 311 (quoting United States v. Bayer, 331 U.S. 532, 540 (1947)), in no way creates a "presumption of compulsion" for the second statement, Elstad, 470 U.S. at 314. Dissenting Justices note that there may be a "'psychological impact of a *voluntary* disclosure of a guilty secret,'" but such disclosure, as a matter of law, does not qualify "'as state compulsion' nor 'compromises the voluntariness' of subsequent confessions." Elstad, 470 U.S. at 312 (Brennan, J., dissenting, joined by Marshall, J.)(emphasis in Elstad)(quoting Elstad, 470 U.S. at 312, 326) .

The Supreme Court next considers midstream-Miranda warnings in Missouri v. Seibert, 542 U.S. 600 (2004)("Seibert"), and issues only a plurality opinion. Seibert, 542 U.S. at 603-05.[19] In Seibert, a young boy with cerebral palsy died in his sleep, and his mother feared charges

---

[19]The Honorable David H. Souter, then-Associate Justice of the Supreme Court, announces the Court's judgment and delivers an opinion joined by the Honorable John Paul

of neglect, because the boy's body was covered in bedsores.  See 542 U.S. at 604.  The mother, along with two of her remaining sons and family friends, conspired to conceal the evidence of neglect by burning the family's mobile home with the boy's dead body in it.  See 542 U.S. at 604.  To avoid the appearance that they had left the boy unattended, they arranged for Donald Rector, a mentally-ill teenager living with the family, to remain in the mobile home while they set fire to it.  See 542 U.S. at 604.  The conspirators executed their plan, and Rector died in the fire.  See 542 U.S. at 604.

Missouri officers subsequently arrested the mother.  See 542 U.S. at 604.  Officer Kevin Clinton refrained from issuing her a Miranda warning on instructions from police headquarters. See Seibert, 542 U.S. at 604.  Another officer, Richard Hanrahan, questioned her at the police station for thirty-forty minutes without a Miranda warning, and she eventually admitted that Rector "was meant to die in the fire."  Seibert, 542 U.S. at 605.  After a twenty-minute break, Hanrahan issues a Miranda warning, obtains a signed waiver of rights and secures the same confession with a similar line of questioning.  See Seibert, 542 U.S. at 605.  According to Hanrahan, he consciously decides to withhold the Miranda warning in accordance with a sanctioned interrogation technique that he had been taught: "question first, then give the warnings, and then repeat the question until he got the answer previously given."  Seibert, 542 U.S. at 600.

On appeal, the Supreme Court notes that Hanrahan's tactic of question first, issue Miranda warnings later, is not confined to Missouri.  See 542 U.S. at 609.  The Supreme Court

---

Stevens, the Honorable Ruth Bader Ginsburg, and the Honorable Stephen G. Breyer, Associate Justices.  See Seibert, 542 U.S. at 603.  Justice Breyer filed a concurrence, and Justice Kennedy concurs in the judgment.  See Seibert, 542 U.S. at 617-18.  Justice O'Connor, joined by then-Chief Justice Rehnquist and Justices Scalia and Thomas, dissent.  See Seibert, 542 U.S. at 622.

further notes that such a tactic is at odds with <u>Miranda</u>'s purpose; <u>Miranda</u> seeks to ensure that

individuals make a "'free and rational choice,'" <u>Seibert</u>, 542 U.S. at 601 (quoting <u>Miranda</u>, 384

U.S. at 464-65), with full knowledge of their Constitutional rights before speaking with officers,

whereas "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a

particularly opportune time to give them, after the suspect has already confessed," <u>Seibert</u>, 542

U.S. at 611. The plurality continues:

> [I]t is likely that if the interrogators employ the technique of withholding
> warnings until after interrogation succeeds in eliciting a confession, the warnings
> will be ineffective in preparing the suspect for successive interrogation, close in
> time and similar in content. . . . Upon hearing warnings only in the aftermath of
> interrogation and just after making a confession, a suspect would hardly think he
> had a genuine right to remain silent, let alone persist in so believing once the
> police began to lead him over the same ground again. . . . What is worse, telling a
> suspect that "anything you say can and will be used against you," without
> expressly excepting the statement just given, could lead to an entirely reasonable
> inference that what he has just said will be used, with subsequent silence being of
> no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated
> and continuing interrogation, they are likely to mislead and "depriv[e] a defendant
> of knowledge essential to his ability to understand the nature of his rights and the
> consequences of abandoning them."

<u>Seibert</u>, 542 U.S. at 613-14 (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 424 (1986)). <u>But see</u>

<u>Seibert</u>, 542 U.S. at 627 (O'Connor, J., dissenting)(critiquing these statements as adopting the

"cat out of the bag" theory that the Supreme Court in <u>Elstad</u> rejects). Accordingly, the plurality

holds that "[t]he threshold issue when interrogators question first and warn later is thus whether

it would be reasonable to find that in these circumstances the warnings could function

'effectively' as *Miranda* requires." <u>Seibert</u>, 542 U.S. at 611-12 (quoting <u>Miranda</u>, 384 U.S. at

467).

The plurality concludes that the following factors bear on whether a midstream <u>Miranda</u>

warning can be effective:

> [(i)] the completeness and detail of the questions and answers in the first round of interrogation[; (ii)] the overlapping content of the two statements[; (iii)] the timing and setting of the first and the second[; (iv)] the continuity of police personnel, and [(v)] the degree to which the interrogator's questions treated the second round as continuous with the first.

Seibert, 542 U.S. at 615.  In its analysis, the plurality adds another factor: whether officers advise the suspect that the pre-Miranda confession could not be used against him.  See Seibert, 542 U.S. at 616 n.7.  Conspicuously absent from those factors is the officer's intent, but the plurality notes that, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work."  542 U.S. at 616 n.6.  The plurality concludes that the midstream Miranda warning is ineffective, because the pre- and post-Miranda questioning occur in the same location, the post-Miranda phase occur only twenty minutes after the pre-Miranda phase, the officers treat the two phases of questioning as continuous, and the pre-Miranda phase leaves "little, if anything, of incriminating potential left unsaid."  Seibert, 542 U.S. at 616-17.

In so holding, the plurality contrasts Seibert with Elstad, and concludes that the officer's failure to warn in Elstad is a good faith Miranda mistake, and that "any causal connection between the first and second [admissions] to the police was 'speculative and attenuated.'"  Seibert, 542 U.S. at 615 (quoting Elstad, 470 U.S. at 313).  "In Elstad, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home," because a reasonable person "could have seen the station house questioning as a new and distinct experience."  Seibert, 542 U.S. at 615.  Moreover, the police station interrogation went "well beyond the scope of the laconic prior admission" in the suspect's living room.  542 U.S. at 614.  Justice Breyer concurs, noting that, "[i]n my view, the following simple rule should apply to the two-stage interrogation technique:

Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." 542 U.S. at 617 (Breyer, J., concurring)(source of quoted material not cited). He joins "the plurality's opinion in full," however, because he concludes that "the plurality's approach in practice will function as a 'fruits' test." 542 U.S. at 618 (Breyer, J., concurring)(quoting Wong Sun v. U.S., 371 U.S. at 477).

Justice Kennedy concurs in the judgment but writes separately and adopted a different test. See Seibert, 542 U.S at 622 (Kennedy, J., concurring). First, he extrapolates a general principle from the Supreme Court's Miranda cases: "Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." Seibert, 542 U.S. at 618-19 (Kennedy, J., concurring). From that general principle, he concludes that an officer's deliberate intent to withhold a Miranda warning in an effort to obtain a confession without informing a suspect of his rights "distorts the meaning of *Miranda* and furthers no legitimate countervailing interest." Seibert, 542 U.S. at 621 (Kennedy, J., concurring). He disagrees with the plurality, however, because the test that the plurality articulates "cuts too broadly." Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

> *Miranda's* clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. Cf. *Berkemer v. McCarty*, 468 U.S. 420, 430 . . . (1984). I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.

Seibert, 542 U.S. at 622 (Kennedy, J., concurring). Accordingly, Justice Kennedy articulates the following test:

> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was

employed.   If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

Seibert, 542 U.S at 622 (Kennedy, J., concurring).[20]

Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas, dissent.  See 542 U.S. at 622 (O'Connor, J., dissenting).  The dissenting Justices conclude that Elstad's voluntariness inquiry should control, and not a multi-factor balancing test or a subjective-intent test.   See Seibert, 542 U.S. at 622-23, 628 (O'Connor, J., dissenting). According to those Justices, a test focusing on the officer's subjective intent misses the mark, because "[f]reedom from compulsion lies at the heart of the Fifth Amendment," so the officer's state of mind is irrelevant.  Seibert, 542 U.S. at 624-25 (O'Connor, J., dissenting)("Thoughts kept inside a police officer's head cannot affect [the suspect's] experience.").  The plurality's approach, on the other hand, is defective, because it adopts the "cat out of the bag theory" that the Supreme Court rejected in Elstad.  542 U.S. at 627 (O'Connor, J., dissenting).  The dissent notes that there are psychological effects on a suspect who confesses pre-Miranda and then endures questioning on the same subjects post-Miranda, but the Supreme Court "refused to endo[w] those psychological effects with constitutional implications" in Elstad.  542 U.S. at 627 (O'Connor, J., concurring)(alteration in original).   The dissent explains that to adopt that approach "would effectively immuniz[e] a suspect to pre-Miranda warning questions from the consequences of his subsequent informed waiver, an immunity that comes at a high cost to legitimate law enforcement activity."  542 U.S. at 627 (O'Connor, J. dissenting)(alteration in

---

[20]The Supreme Court later applies Seibert in a per curiam review of a habeas petition, but it does not resolve which test is controlling as it applies both the plurality's factors and factors which Justice Kennedy's concurrence articulated.  See Bobby v. Dixon, 565 U.S. 23, 30-32 (2011)(per curiam).

original).  Accordingly, the dissent would have ordered a remand for the State court to determine whether the statements were made voluntarily.  See 542 U.S. at 628 (O'Connor, J. dissenting).

In United States v. Guillen, 995 F.3d 1095 (10th Cir. 2021), the Tenth Circuit holds that "Justice Kennedy's concurrence is the binding opinion from Seibert."  995 F.3d at 1114. The Tenth Circuit arrives at this holding by applying the rule that, "'[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds."'"  United States v. Guillen, 995 F.3d at 1114 (quoting Marks v. United States, 430 U.S. 188, 193 (1977)(quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976))).  The Tenth Circuit explains that Justice Kennedy concurs with the plurality on the narrowest grounds and is "'a logical subset'" of the plurality opinion.  United States v. Guillen, 995 F.3d at 1114 (quoting United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006).  The Tenth Circuit joins the majority of Courts of Appeals in holding that "Justice Kennedy's Seibert opinion provides the controlling standard for assessing the admissibility of incriminating statements given subsequent to midstream Miranda warnings."  United States v. Guillen, 995 F.3d at 1116 (citing United States v. Capers, 627 F.3d 470, 476 (2d Cir. 2010); United States v. Ollie, 442 F.3d 1135, 1142 (8th Cir. 2006); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006); United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006); United States v. Naranjo, 426 F.3d 221, 231-32 (3d Cir. 2005)(Alito, J., on the panel); United States v. Mashburn, 406 F.3d 303, 308-09 (4th Cir. 2005)).

**LAW REGARDING VOLUNTARINESS OF STATEMENTS**

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or

- 62 -

property, without due process of law." U.S. Const. amend. V.  The Due Process Clause requires

that, to be admissible, a defendant must make statements voluntarily.  See Dickerson, 530 U.S. at

433 ("Over time, our cases recognized two constitutional bases for the requirement that a

confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-

incrimination and the Due Process Clause of the Fourteenth Amendment." (citing Brown v.

Mississippi, 297 U.S. 278 (1936), and Bram v. United States, 168 U.S. 532, 542 (1897))).

> It is now axiomatic that a defendant in a criminal case is deprived of due
> process of law if his conviction is founded, in whole or in part, upon an
> involuntary confession, without regard for the truth or falsity of the
> confession, . . . and even though there is ample evidence aside from the
> confession to support the conviction.

Jackson v. Denno, 378 U.S. 368, 376 (1964)(citing Rogers v. Richmond, 365 U.S. 534 (1961);

Malinski v. New York, 324 U.S. 401 (1945); Stroble v. California, 343 U.S. 181 (1952); Payne

v. Arkansas, 356 U.S. 560 (1958)).

The Supreme Court has declared that a defendant has the constitutional right "at some

stage in the proceedings to object to the use of the confession and to have a fair hearing and a

reliable determination on the issue of voluntariness."  Jackson v. Denno, 378 U.S. at 376-77

(citing Rogers v. Richmond, 365 U.S. 534).  The United States bears the burden to demonstrate

by a preponderance of the evidence that the statement is voluntary.  See Missouri v. Seibert, 542

U.S. at 608 n.1; Lego v. Twomey, 404 U.S. 477, 489 (1972)("[T]he prosecution must prove at

least by a preponderance of the evidence that the confession was voluntary."); United States v.

McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996)("The prosecution has the burden of proving by

at least a preponderance of evidence that the confession was voluntary." (citing Lego v.

Twomey, 404 U.S. 477, 489 (1972))).

The due process voluntariness test examines "'whether a defendant's will was overborne'

by the circumstances surrounding the giving of a confession." Dickerson, 530 U.S. at 434 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). "The due process test takes into consideration 'the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation.'" Dickerson, 530 U.S. at 434 (quoting Schneckloth v. Bustamonte, 412 U.S. at 226). The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing." Dickerson, 530 U.S. at 434 (internal quotations omitted)(quoting Stein v. New York, 346 U.S. 156, 185 (1953)).

The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986)("Connelly"). Indeed, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[21]

_____

[21]The Tenth Circuit has not always explicitly heeded Connelly's threshold "coercive police activity" inquiry. E.g., United States v. Toles, 297 F.3d, 959, 966 (10th Cir. 2002)("Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation.")("Toles"); see Sharp v. Rohling, 793 F.3d 1216, 1233 (10th Cir. 2015)("The totality of the circumstances test does not favor any one of these factors over the others -- it is a case-specific inquiry where the importance of any given factor can vary in each situation"). Instead, the Tenth Circuit has sometimes followed Toles in more or less throwing all the factors in the hopper, without any consideration of police conduct as a "necessary predicate" for finding a statement was made involuntarily under the Fourteenth Amendment. Connelly, 479 U.S. at 167. See Toles, 297 F.3d at 966 (instructing courts -- without mention of Connelly -- to consider "both the characteristics of the accused and the details of the interrogation" using these factors: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment." (citing United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009))); Criminal Pattern Jury Instruction Committee of the Tenth Circuit, Pattern Criminal Jury Instructions, Comment to Instruction on Voluntariness of Statement by Defendant, at 40-41 (2021)("According to Toles, the determination of voluntariness is based on the totality of circumstances, including the characteristics of the accused and the details of the interrogation."). Accord United States v. Ravenell, 810 F. App'x

Connelly, 479 U.S. at 167.   See United States v. Young, 964 F.3d 938, 946 (10th Cir.

2020)(dividing voluntariness analysis into (i) police coercion and (ii) personal characteristics and

specifying that, "because we agree that [the agent's] conduct was coercive, we turn to [the

---

625, 628 (10th Cir. 2020)(stating that the "essence of voluntariness is whether the government obtained these statements by physical or psychological coercion" but not that coercion is a necessary predicate). Other Tenth Circuit cases have found a sort of middle ground, recognizing the "necessary predicate" of police coercion but proceeding to an analysis of the defendant's personal characteristics before finding that police actions were coercive.   See, e.g., United States v. Lamy, 521 F.3d 1257, 1261-62 (10th Cir. 2008).

The Tenth Circuit is not alone in skipping Connelly's predicate inquiry when conducting voluntariness analyses.   The Supreme Court, in Arizona v. Fulminante, 499 U.S. 279 (1991), analyzes voluntariness using the "totality of the circumstances test" without mention of police coercion being a "necessary predicate." 499 U.S. at 286.   Nevertheless, as recently as 2010, the Supreme Court quotes Connelly for the proposition that the "Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion."   Berghuis v. Thompkins, 560 U.S. 370, 387 (2010)(quoting Connelly, 479 U.S. at 170).

Scholars have long acknowledged that the totality of the circumstances voluntariness test "virtually invite[s] [courts] to give weight to their subjective preferences when performing the elusive task of balancing."   Stephen Schulhofer, Confessions and the Court, 79 Mich. L. Rev. 865, 870 (1981).   See Lisa Kern Griffin, Silence, Confessions, and the New Accuracy Imperative, 65 Duke L.J. 697, 709 (2016)("'[The] totality of the circumstances' inquiry [including t]he nature of law enforcement's threats and promises, the conditions of the questioning, and the suspect's particular vulnerabilities [is a] subjective test [that] has proven unpredictable."). As a result of this "hazy and unfocused" voluntariness doctrine, one scholar argues that courts should use different analyses based on what underlying rationale for the voluntariness doctrine is implicated by the case: police misconduct or the confession's reliability. Eve Brensike Primus, The Future of Confession Law: Toward Rules for the Voluntariness Test, 114 Mich. L. Rev. 1, 3, 24 (2015)("Confession Law").   According to Professor Eve Brensike Primus of University of Michigan Law School, for cases implicating offensive police conduct, courts should "begin by asking whether any tactic that the police used is per se offensive," and if the case is not per se offensive, "the court can then engage in a totality-of-the-circumstances analysis that considers whether the sum total of tactics used is offensive."   Confession Law at 41. On the other hand, she continues, for cases where the question centers on the confession's reliability, courts should conduct a two-part evaluation: (i) "there must be evidence of police 'wrongdoing' sufficient to satisfy the Connelly threshold" and (ii) "the resulting confession must be unreliable."   Confession Law at 41 (source of quoted material not cited).   The Court agrees with Professor Primus' more targeted approach to evaluating the voluntariness of confessions, and under the facts of this case, this approach would lead the Court to a denial of the motion, because there is no evidence of police wrongdoing.  Because the Tenth Circuit has yet to adopt this bifurcated approach, however, the Court cannot use the approach here.

defendant's] personal characteristics to answer the ultimate question: whether [the defendant's] statements were voluntary"); United States v. Lopez, 437 F.3d 1059, 1064 (10th Cir. 2006)("[P]ersonal characteristics 'are relevant only if this court first concludes that the officers' conduct was coercive.'" (quoting United States v. Erving L., 147 F.3d 1240, 1249 (10th Cir.1998))); United States v. Rodebaugh, 798 F.3d 1281, 1290 (10th Cir. 2015)(noting the necessary predicate requirement of Connelly); Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004)(same).

The Supreme Court in Connelly reasons that, because State action is required to elicit Constitutional due process protection, it is a necessary predicate -- a threshold inquiry. See Connelly, 479 U.S. at 165. If -- without state action -- the unreliability of a mentally ill defendant's statement is at issue, the "matter [should] be governed by the evidentiary laws of the forum, see, e.g., Fed. R. Evid. 601, and not by the Due Process Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 167. Further, if coercive police action is not necessary to find a confession involuntary, voluntariness jurisprudence "would expand . . . into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." Connelly, 479 U.S. at 165. A defendant's characteristics still may be relevant to a coercion analysis, however, where officers were or should reasonably have been aware of the condition, such as a defendant's obvious youth or readily apparent intellectual disability. See Connelly, 479 U.S. at 164 (implying that, when police use psychological tactics knowing a defendant's mental condition, that fact may constitute coercion, even if "a defendant's mental condition, by itself and apart from its relation to official coercion," would not weigh heavily in the voluntariness analysis); United States v. Preston, 751 F.3d 1008, 1020 (9th Cir. 2014)(en banc)(finding that a

confession made by an eighteen-year-old with an intellectual disability was coerced, in part because the "two officers realized early in the interrogation that [the defendant] suffered some sort of intellectual disability").[22]

Following Connelly, courts should consider the details of the interrogation to determine whether government action would trigger constitutional protection before evaluating the defendant's personal characteristics. See United States v. Lopez, 437 F.3d at 1064; United States v. Young, 964 F.3d at 943. Beyond Connelly's threshold inquiry of coercive police activity, courts weigh the following factors when determining whether a statement was made voluntarily: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." United States v. Lopez, 437 F.3d at 1063-64 (quoting Toles, 297 F.3d at 965-66).

The Court analyzes voluntariness in United States v. Martinez, No. CR 02-1055, 2006 WL 4079686, at *13-14 (D.N.M. November 21, 2006)(Browning, J.). There, it concludes that a defendant voluntarily confessed where he was in custody for five hours and interrogated for only about two hours. See 2006 WL 4079686, at *14. While the defendant argued that agents had made promises of leniency to him, the Court concludes that "the agents indicated to him that they could not make him any promises," and that his fate was in the judge and prosecutors' hands. 2006 WL 4079686, at *14. The defendant also signed a Miranda waiver and a statement that no promises had been made to him. 2006 WL 4079686, at *14. See United States v. Torres-

---

[22]See Confession Law, supra, at 40 ("[I]f the question is about the offensiveness of the police conduct, it must be answered with reference only to those facts about the suspect that the police knew or should have known when they conducted the interrogation.").

Castro, 374 F. Supp. 2d 994, 1003 (D.N.M. 2005)(Browning, J.)(finding a defendant's statement to be voluntary when officers questioned the defendant in his home with other occupants present in both Spanish and English, and, although it was "not mandatory" for a finding of voluntariness, "specifically advised [the defendant] that he was not required to answer" their question about a weapon), aff'd, 470 F.3d 992 (10th Cir. 2006).

## ANALYSIS

The discovery of evidence and subsequent statements Diego Sena made violate neither his Fourth nor Fifth Amendment rights, because (i) Rodriguez searched the trunk based on probable cause, and (ii) Rodriguez' roadside questioning of Diego Sena does not constitute a custodial interrogation, nor were Diego Sena's statements involuntarily made. First, the Court holds that Rodriguez' vehicle search is Constitutionally valid. Rodriguez established probable cause, although only reasonable suspicion is needed, to extend the traffic stop. Further, probable cause permitted Rodriguez to search the vehicle's trunk because, under the automobile exception, officers may search a vehicle if they have probable cause to believe the vehicle contains contraband. Second, the Court holds that Rodriguez' roadside questioning of Diego Sena is not a custodial interrogation, so a Miranda warning is not required. The roadside questioning does not violate Diego Sena's Fifth Amendment right to due process by eliciting an involuntary statement. Because the officers did not act coercively, Diego Sena made his statements voluntarily. Even assuming that Diego Sena is entitled to a Miranda warning during the roadside questioning, the United States does not intend to offer any statements made at that time, and, under Justice Kennedy's Seibert framework, as adopted by the Tenth Circuit in United States v. Guillen, 995 F.3d 1095, 1114 (10th Cir. 2021), Rodriguez' good faith omission of the Miranda warnings do not poison the subsequent waiver and confession Diego Sena made to King

and Beckford.  In conclusion, the Court holds that each step in the sequence of events that led to the discovery of evidence in Diego Sena's vehicle is Constitutionally justified.  The Court, therefore, denies Diego Sena's MTS.

**I.      RODRIGUEZ' SEARCH OF THE VEHICLE'S TRUNK IS CONSTITUTIONALLY PERMISSIBLE, BECAUSE RODRIGUEZ FORMED PROBABLE CAUSE TO EXTEND THE TRAFFIC STOP AND POSSESSED <u>PROBABLE CAUSE TO SEARCH THE TRUNK</u>.**

Rodriguez, who effected the traffic stop on Diego Sena, possessed information rising to probable cause that Diego Sena was violating the federal law prohibiting possession of marijuana, <u>see</u> 21 U.S.C. § 812(c)(d)(1), which gave Rodriguez authority to prolong the traffic stop and search the vehicle's trunk.  When an officer prolongs the traffic stop to investigate further criminal activity, the officer detains the driver and passengers; this detention implicates the Fourth Amendment, and reasonable suspicion must justify the extension.  <u>See</u> <u>United States v. Toro-Pelaez</u>, 107 F.3d 819, 823-24 (10th Cir. 1997).  Officers may search a vehicle based on probable cause under the automobile exception.  <u>See</u> <u>United States v. Phillips</u>, 71 F.4th 817, 823 (10th Cir. 2023)("'[P]robable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence.'" (quoting <u>United States v. Vasquez-Castillo</u>, 258 F.3d 1207, 1212 (10th Cir. 2001))).  Here, Rodriguez had formed probable cause at the time that he extended the traffic stop and when he searched the vehicle.  Rodriguez' extension of the traffic stop and search of the vehicle's trunk are, therefore, Constitutionally justified.

A.  **THE EXTENSION OF THE TRAFFIC STOP IS CONSTITUTIONAL ON THE BASIS OF PROBABLE CAUSE THAT DIEGO SENA VIOLATED FEDERAL LAW PROHIBITING POSSESSION OF MARIJUANA, ALTHOUGH PROBABLE CAUSE IS MORE THAN IS REQUIRED TO EXTEND A TRAFFIC STOP.**

For an officer to initiate a traffic stop, the officer need possess only reasonable suspicion that the driver violated a law.  See Rodriguez v. United States, 575 U.S. 348, 354 (2015)("'[A] relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called 'Terry stop' . . . than to a formal arrest.'" (quoting Knowles v. Iowa, 525 U.S. at 117)).  Here, Diego Sena does not challenge whether Rodriguez possessed reasonable suspicion that Diego Sena was violating the speed limit, both through observing Diego Sena's car speeding and through the alert from the speed radar.  See MTS at 5-6 (arguing that Rodriguez "did not form reasonable suspicion to prolong the stop" beyond the purpose of addressing the traffic violation).  Similarly, for a police officer to extend a traffic stop beyond its original purpose, the officer must possess reasonable suspicion that criminal activity, beyond the traffic violation, is ongoing.  See United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998)("[T]he officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." (citing United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993))).  Because Rodriguez v. United States prevents officers from unduly prolonging a traffic stop "beyond the time reasonably required" to issue the ticket, 575 U.S. at 354-55 (quoting Illinois v. Caballes, 543 U.S. at 407), the Tenth Circuit refers to the moment an officer extends the traffic stop beyond its traffic purpose as a "Rodriguez moment," United States v. Batara-Molina, 60 F.4th 1251, 1255 n.1 (10th Cir. 2023)("This moment that the stop is prolonged such that reasonable suspicion was necessary is referred to as the 'Rodriguez moment.'" (source of quoted material not cited)).  Thus, at the Rodriguez moment, the officer

must have reasonable suspicion that that criminal activity is occurring, separate from the traffic infraction which initially justified the stop.  See United States v. Pettit, 785 F.3d 1374, 1379 (10th Cir. 2015); Rodriguez v. United States, 575 U.S. at 355 (specifying that an officer may prolong the stop beyond its traffic purpose if the officer possesses "the reasonable suspicion ordinarily demanded to justify detaining an individual).  "[N]ot an onerous standard," reasonable suspicion "accrues when an officer possesses a 'particularized and objective basis for suspecting criminal conduct under a totality of the circumstances.'" United States v. Cortez, 965 F.3d 827, 834 (10th Cir. 2020)(quoting United States v. Petit, 785 F.3d at 1379).

Here, Diego Sena argues that the Rodriguez moment occurs when Rodriguez tells Diego Sena that he would be giving him a written warning, which happens almost immediately upon Rodriguez and Diego Sena entering Rodriguez' police vehicle, and only two minutes after Diego Sena pulled onto the road's shoulder.  See FOF ¶ 24 at 7; Rodriguez Lapel Footage at 7:15-7:26 (Rodriguez)(stating that he would give Diego Sena a written warning); id at 5:26-5:50 (Rodriguez)(parking and initially approaching Diego Sena's vehicle).  Specifically, Diego Sena argues that, by checking Diego Sena's VIN numbers and speaking with Delores Sena about her travel plans while he checked the VIN numbers after he told Diego Sena that he would issue a written warning for speeding, Rodriguez acted improperly after the "traffic mission was over." Tr. at 157:11-17 (Torgoley).  Deigo Sena therefore argues that the travel inconsistency, which Rodriguez discovered while he was speaking with Delores Sena "under the pretense of a VIN inquiry," improperly contributed to Rodriguez' probable cause.  Tr. at 157:18-22.  Diego Sena further contends that Rodriguez establishes probable cause "only then," after finding that "contradiction."  Tr. at 157:22-25.

The Tenth Circuit, however, has never held that the traffic stop's purpose is fulfilled at the instant that the officer conveys to the detained driver what remedy the officer intends to issue.  Instead, the traffic purpose encompasses checking a VIN, because checking the VIN operates "like a demand to see license and registration papers."  New York v. Class, 475 U.S. 106, 115 (1986)("[A] demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop.").  Officers "may also generally inquire about the driver's travel plans, and ask questions, whether or not related to the purpose of the stop, so long as they do not prolong the stop."  United States v. Moore, 795 F.3d 1224, 1229 (10th Cir. 2015)(citing United States v. Williams, 271 F.3d 1262, 1267 (10th Cir. 2001), and United States v. Simpson, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010)).  The Tenth Circuit has specified that the traffic purpose ends "[o]nce an officer returns the driver's license and registration," and at that point, "questioning must cease."  United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009).  See United States v. Manjarrez, 348 F.3d 881, 885 (10th Cir. 2003)("A stop generally ends when the officer returns the driver's license, registration, and insurance information.").

Following Diego Sena's logic, officers would complete the "purpose of the stop" -- which is to "address[ ] the infraction," Rodriguez v. United States, 575 U.S. at 354 -- when the officer tells the detained driver whether the officer will be issuing a ticket, not when the officer issues the ticket or written warning.  See Tr. at 155:7-11 (Torgoley)("[I]t is our argument that it was prolonged beyond the traffic mission at approximately the time where Officer Rodriguez informed Mr. Sena that he would get a written warning.").  The Court opts instead to follow precedent and hold that Rodriguez "addressed the infraction," by issuing Diego Sena a written warning and returning his license and registration, which occurred eight minutes after Diego

Sena stopped and six minutes after Rodriguez told Diego Sena that he would be giving Diego Sena a written warning.  See FOF ¶ 31 at 8; Rodriguez Lapel Footage at 13:25-13:45 (Rodriguez issuing the printed and signed warning); Police Report at 3.  In fact, eight minutes is faster than Rodriguez' typical traffic stops.  See Tr. at 113:3-10 (Rodriguez, Spindle)(stating that an eight-minute traffic stop is "actually a little bit less" than Rodriguez' typical traffic stops, which are "usually . . . 10, 12 minutes" long).  Rodriguez' VIN check and conversation with Delores Sena about her travel story, therefore, did not "prolong the stop."  United States v. Moore, 795 F.3d 1224, 1229 (10th Cir. 2015).  The Rodriguez moment happens, not when Rodriguez states his intention to issue a written warning, but when he asks Diego Sena about drugs being in the vehicle, after he issues the printed warning and returns Diego Sena's documentation.  See FOF ¶ 32 at 8; Rodriguez Lapel Footage at 13:25-13:45 (Rodriguez)(stating he that had to "address something" and asking about the marijuana smell, after issuing the warning).  When Rodriguez checked the vehicle's VIN and asked Delores Sena about her travel plans, he had not yet issued Diego Sena his ticket.  See FOF ¶ 25, 27 at 7.  Both checking a vehicle's VIN and asking Delores Sena about her travel plans are permissible traffic related tasks.  See New York v. Class, 475 U.S. at 115; United States v. Moore, 795 F.3d at 1229.

At the Rodriguez moment, Rodriguez needed to possess, at a minimum, reasonable suspicion that Diego Sena was involved in criminal activity.  The Court holds, however, that Rodriguez possessed informed beliefs that exceeded that Constitutional minimum and amounted to probable cause that Diego Sena was violating the federal law prohibiting possession of marijuana when he issued the warning and asked Diego Sena about the drugs.

**B.    RODRIGUEZ' SEARCH OF THE TRUNK IS CONSTITUTIONALLY PERMISSIBLE, BECAUSE RODRIGUEZ HAD PROBABLE CAUSE TO BELIEVE DIEGO SENA VIOLATED FEDERAL LAW PROHIBITING POSSESSION OF MARIJUANA, SATISFYING THE THRESHOLD FOR A VEHICLE SEARCH UNDER THE AUTOMOBILE EXCEPTION.**

The Fourth Amendment protects against "unreasonable searches and seizures," U.S. Const. amend. IV., and "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions," Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).  One of these "specifically established and well-delineated" exceptions is the automobile exception, which Carroll v. United States establishes.  United States v. Ross, 456 U.S. 798, 825 (1982).  Because vehicles are readily moveable, there is a greater risk that contraband will be moved out of the jurisdiction before police officers are able to get a warrant.  See Carroll v. United States, 267 U.S. at 153.  The Supreme Court, consequently, established the automobile exception: "[A] warrantless search of an automobile stopped by police officers who ha[ve] probable cause to believe the vehicle contain[s] contraband [i]s not unreasonable within the meaning of the Fourth Amendment."  United States v. Ross, 456 U.S. at 799 (citing Carroll v. United States, 267 U.S. 132).  See United States v. Beckstead, 500 F.3d 1154, 1165 (10th Cir. 2007)("The rationale for the automobile exception is based on both the inherent mobility of cars (as it is often impracticable to obtain a warrant before a car can be driven away) and the fact that there is a reduced expectation of privacy with motor vehicles.").

The scope of an automobile exception search is "as thorough as a magistrate could authorize in a warrant."  United States v. Ross, 456 U.S. at 800.  Further, the container's character, e.g., whether the container is locked or open, does not determine the search's scope; instead, the search's scope "is defined by the object of the search and the places in which there is

probable cause to believe that it may be found." United States v. Ross, 456 U.S. at 824. Without exceeding the bounds of reasonableness, an officer "may deem it necessary to perform 'separate acts of entry or opening' in order to conduct the search." United States v. Mirabal, 876 F.3d 1029, 1033 (10th Cir. 2017)(quoting United States v. Ross, 456 U.S. at 820-21). Locked containers are equally subject to search as unlocked containers. See United States v. Ross, 456 U.S. at 824 ("[A] traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf [can] claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attaché case."); United States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)("One of these specifically established exceptions is the 'automobile exception' which allows the police to 'search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.'" (quoting California v. Acevedo, 500 U.S. at 580)); United States v. Wicks, 995 F.2d 964, 974 n.7 (10th Cir. 1993)(holding that the search of locked briefcases was a permissible container search as allowed by United States v. Ross). The Tenth Circuit has interpreted this standard to boil down to: where the officers, in each individual case, have reason to believe that contraband may be located. See United States v. Palms, 21 F.4th 689, 700 (10th Cir. 2021)("In general, 'investigators executing a warrant can look anywhere where evidence described in the warrant might conceivably be located.'" (citing United States v. Loera, 923 F.3d 907, 916 (10th Cir. 2019))). "[S]o long as the officer's conduct remains within the boundaries of reasonableness, an officer has discretion over the details of how best to proceed" to execute the search. Lawmaster v. Ward, 125 F.3d 1341, 1349 (10th Cir. 1997).

"[T]he odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage," United States v. Downs, 151 F.3d 1301, 1303 (10th Cir. 1998)(quoting

United States v. Nielsen, 9 F.3d 1487, 1490 (10th Cir. 1993)), but if the odor is of burnt marijuana, the scope of the search is more limited, see United States v. Nielsen, 9 F.3d at 1491. Unlike the odor of raw marijuana, a burnt marijuana smell in the passenger compartment establishes probable cause to search the trunk only if officers find corroborating evidence of contraband in the passenger compartment.  See United States v. Nielsen, 9 F.3d at 1491 (holding that burnt marijuana's smell in the passenger compartment, without corroborating evidence of contraband discovered in the passenger compartment, does not establish probable cause for a search of the vehicle's trunk, because it would not "lead a person of ordinary caution to believe" the trunk contains marijuana); United States v. Parker, 72 F.3d 1444, 1450 (10th Cir. 1995) (concluding that the officers have probable cause to search the trunk after officers smelled burnt marijuana in the passenger compartment and discovered a "rolled-up dollar bill containing white powder residue and [a] marijuana cigarette" in the passenger compartment).  On the other hand, the smell of raw marijuana alone establishes probable cause to search a vehicle's trunk, because raw marijuana, unlike burnt marijuana, suggests that the contraband may be trafficked in the vehicle's trunk.  See United States v. Vasquez-Castillo, 258 F.3d 1207, 1213 (10th Cir. 2001)("When an officer encounters the smell of raw marijuana, there is the fair probability that the vehicle is being used to transport marijuana 'and that the marijuana has been secreted in places other than the passenger compartment.'" (quoting United States v. Downs, 151 F.3d at 1303)); Abbo v. Wyoming, 596 F. App'x 709, 713 (10th Cir. 2014)(unpublished)(noting that United States v. Nielsen "supports the proposition that the odor of raw marijuana provides probable cause to search the entirety of a vehicle").  The distinction between raw and burnt marijuana odors is "premised on the common-sense proposition that the smell of burnt marijuana is indicative of drug usage, rather than drug trafficking, [ ] because it is unreasonable to believe

people smoke marijuana in the trunks of cars," whereas the smell of raw marijuana suggests a

possibility of trafficking.  United States v. Wald, 216 F.3d 1222, 1226 (10th Cir. 2000).  The

Court acknowledges that New Mexico legalized marijuana for recreational use in 2021 with the

Cannabis Regulation Act, see N.M.S.A. 1978, § 26-2C-25(A), but federally, marijuana

possession is still illegal as a Schedule I substance, see 21 U.S.C. § 812(c)(d)(1).[23]

---

[23]The Constitution "with[eld] from Congress a plenary police power," instead reserving a general police power for the States.  United States v. Lopez, 514 U.S. 549, 566 (1995).  The federal government is permitted, however, to regulate drug use through the Controlled Substances Act, because of the drug trade's effect on interstate commerce; thus, that type of regulation is "well within Congress' commerce power."  Gonzales v. Raich, 545 U.S. 1, 15 (2005).  In 2005, the Supreme Court found that local marijuana activity, which was legalized in California for medical purposes, was within "congressional reach" and, reiterating the supremacy of federal law, reasoned that, "if there is any conflict between federal and state law, federal law shall prevail."  Gonzales v. Raich, 545 U.S. at 29.  See Coats v. Dish Network, 2015 CO 44, 350 P.3d 849, 853 (concluding that an employee who was authorized to use medical marijuana could be fired for the marijuana use outside of employment hours because the defendant's "use of medical marijuana was unlawful under federal law and thus not protected by" Colorado's employment discrimination statute).  Indeed, the Supreme Court cautioned that "state action cannot circumscribe Congress' plenary commerce power."  Gonzales v. Raich, 545 U.S. at 29.  And federal criminal law has expanded so greatly that it "now overlaps almost entirely with state criminal law."  Joshua M. Divine, Statutory Federalism and Criminal Law, 106 Va. L. Rev. 127, 165 (2020).

As of May 2, 2024, twenty-four states, the District of Columbia, Guam, and the Northern Mariana Islands have laws legalizing the recreational use of marijuana.  See The Federal Status of Marijuana and the Policy Gap with States 1, Cong. Rsch. Serv. (May 2, 2024), https://crsreports.congress.gov/product/pdf/IF/IF12270 (last visited July 23, 2024).  And federal enforcement of the ban on simple marijuana possession has varied significantly over the last decade.  See Memorandum from Deputy Att'y Gen. James M. Cole for All U.S. Att'ys on Guidance Regarding Marijuana Enf't, 3 (August 29, 2013)(encouraging federal law enforcement to allow "state and local law enforcement and regulatory bodies [to] remain the primary means of addressing marijuana-related activities" in jurisdictions where marijuana use was legalized and stating this would be "consistent with the traditional allocation of federal-state efforts in this area"); Memorandum from Att'y Gen. Jefferson B. Sessions for All U.S. Att'ys on Marijuana Enf't (January 4, 2018)(rescinding "guidance specific to marijuana enforcement" because it "is unnecessary" and instructing prosecutors to "weigh all relevant considerations" in deciding which activities to prosecute); Proclamation No. 10467, 87 Fed. Reg. 61441 (Oct. 6, 2022)(President Biden pardoning citizens "who committed the offense of simple possession of marijuana in violation of the Controlled Substances Act").  At the time of Diego Sena's offense, federal prosecution of simple possession of marijuana -- especially in New Mexico, where

marijuana is legal for recreational use -- was disfavored.  See Tr. at 96:13-24 (Rodriguez, Torgoley)(stating that Rodriguez understood that federal "marijuana based prosecutions" were "disfavored" and specifying that, "[b]ecause of the strength of the odor, [he] thought it was going to be a large amount of marijuana").  Indeed, the Department of Justice has dedicated resources to "expeditiously administer" the President's pardon of "individuals who engaged in simple possession of marijuana," including "restoring political, civil, and other rights to those convicted of that offense."  Press Release, Department of Justice Spokesman Anthony Coley, Justice Department Statement on President's Announcements Regarding Simple Possession of Marijuana (October 6, 2022).

Thus, in New Mexico and many other States, there is a tension between three opposing forces: (1) the legality of possessing raw marijuana at the State-level; (2) the extremely low likelihood of a federal prosecution for simple marijuana possession; and (3) the ability of federal law enforcement officers to use the smell of raw marijuana to establish probable cause to search a vehicle -- even absent any other suspicious behavior.  See United States v. Morin, 949 F.2d 297, 300 (10th Cir. 1991)("[T]he odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage"); Abbo v. Wyoming, 596 F. App'x at 713 (noting that United States v. Nielsen "supports the proposition that the odor of raw marijuana provides probable cause to search the entirety of a vehicle."); United States v. Torres, 987 F.3d 893, 903 (10th Cir. 2021)(concluding that "police had reasonable suspicion to believe that [the defendant] or his passenger was violating the federal drug laws' prohibition against the possession of marijuana" after the officers smelled burnt marijuana).

While there is no dispute, of course, over whether federal law preempts a State's legalization of marijuana, scholars have noted that the conflicting criminal laws place individuals' Fourth Amendment rights against unreasonable search and seizure in a precarious position.  See Deborah Ahrens, Recalibrating Suspicion in an Era of Hazy Legality, 43 Seattle U. L. Rev. 901, 915 (2020)("Recalibrating Suspicion")("Courts should no longer use marijuana odor as part of a Fourth Amendment seizure analysis because the harm caused by these intrusive policies is what helped spur marijuana legalization in the first place."); id. at 914-15 (arguing that "state legislatures should consider treating marijuana legalization as an opportunity to delineate what comprises reasonable suspicion or probable cause in a jurisdiction" and reduce racially motivated pretextual stops); Alex C. Carroll, Weed, Dogs & Traffic Stops, 21 Wyo. L. Rev. 1, 31 (2021)(arguing that, in states that have legalized marijuana use for medicinal or recreational purposes, a dog sniff during a routine traffic stop implicated the Fourth Amendment in a new way and should be considered a "search" because "certain individuals have a right to possess marijuana under state law." (emphasis omitted)).  C.f. Orin S. Kerr, Cross-Enforcement of the Fourth Amendment, 132 Harv. L. Rev. 471, 475 (2018)(arguing that courts have not settled the issue of which Fourth Amendment standard may be applied where state and federal criminal laws conflict); Joshua M. Divine, Statutory Federalism and Criminal Law, 106 Va. L. Rev. 127, 135 (2020)(arguing that Congress' failure to include a dynamic incorporation clause in the Controlled Substances Act is partly responsible for the confusion about criminal enforcement where state and federal criminal laws diverge, in part because "dynamic incorporation can give local officials tremendous influence over how and when federal law will apply -- indeed, even whether federal law will apply at all.").

Further, whether an officer had probable cause to search a vehicle is not dependent on how much of the suspected substance was ultimately discovered "because 'we do not evaluate probable cause in hindsight, based on what a search does or does not turn up.'" United States v. Phillips, 71 F.4th 817, 825 (10th Cir. 2023)(quoting Florida v. Harris, 568 U.S. 237, 249 (2013)). But see Recalibrating Suspicion at 916 ("If police know that they can justify a search if they articulate that they smelled marijuana, they may say they smelled marijuana whether they did or did not, and our only means of evaluating their veracity may be observing how often -- or how infrequently -- a search uncovered cannabis."). And much of the fact-finding in cases where an officer claims to have smelled marijuana as a basis for a search turns on whether the district court finds the officer's testimony to be credible. See United States v. Phillips, 71 F.4th at 824 (when evaluating whether an officer may have smelled marijuana, emphasizing that the district court is best suited to make credibility determinations and the Tenth Circuit is "loath to usurp the role of factfinder"); United States v. Pittman, 782 F. App'x 663, 666 (10th Cir.

---

Federal officers and TFOs already have broad discretion to decide which behaviors are suspicious. See United States v. Frazier, 30 F.4th 1165, 1174 (10th Cir. 2022)("Given the specialized training and experience that law enforcement officers have, we generally defer to their ability to distinguish between innocent and suspicious behavior . . ."). With the addition of the tension between state legality and federal illegality, federal officers and TFOs can decide when to use the raw marijuana odor as reasonable suspicion and when to opt not to search a vehicle, under the rationale that possessing raw marijuana is legal at the State level.

In this case, Rodriguez testified that he does not search every vehicle in which he smells marijuana. See Tr. at 71:18-21 (Rodriguez, Torgoley). Rodriguez estimated that, in about ten percent of the instances in which he smells marijuana, it is a situation where the drivers "are not nervous" and say something along the lines of "Hey, we are both going to Albuquerque. We are going to go have fun at Top G[olf]." Tr. at 72:4-11 (Rodriguez, Torgoley). Rodriguez uses his discretion in those situations to not search based on a burnt marijuana odor. Tr. at 72:6-11 (Rodriguez). But he always searches a vehicle when he detects a "strong odor" of raw marijuana. See Tr. at 72:6-24 (Rodriguez, Torgoley). Although this Court notes the Fourth Amendment implications for activity which is legal at the State-level and the wide discretion for federal law enforcement officers, this Court is bound to apply precedent. The precedent is clear: raw marijuana odor establishes probable cause to search the entirety of a vehicle, including the trunk. See United States v. Vasquez-Castillo, 258 F.3d 1207, 1213 (10th Cir. 2001).

2019)(unpublished)(upholding a district court's determination that an officer smelled marijuana because, under the clear error standard for factual questions, "'[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous'" (quoting United States v. Salazar-Samaniega, 361 F.3d 1271, 1278 (10th Cir. 2004))).

Various federal agencies have created task forces to pool resources with local and state law enforcement.   Task force officers for the Drug Enforcement Administration ("DEA") are designated by the Attorney General and statutorily authorized to "make arrests without warrant (A) for any offense against the United States committed in his presence, or (B) for any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony."   21 U.S.C. § 878.   Task force officers are often recognized by the Tenth Circuit.   See, e.g., United States v. Hayes, 62 F.4th 1271, 1273 (10th Cir. 2023)(Baldock, J., concurring)(discussing a DEA task force officer); United States v. DeVargas, 64 F.4th 1148, 1154 (10th Cir. 2023)(discussing a Federal Bureau of Investigation task force officer).

Here, Rodriguez was deputized by HSI as a task force officer and was therefore authorized to enforce federal law.   See FOF ¶ 3, at 4.   Because marijuana possession remains federally illegal as a controlled substance, the smell of raw marijuana alone gave Rodriguez probable cause to search the vehicle for marijuana, including places in the vehicle "in which there is probable cause to believe that it may be found."   United States v. Ross, 456 U.S. at 824. Rodriguez detected the odor of marijuana upon Diego Sena rolling down the back windows when Rodriguez was standing outside of the vehicle.   See FOF ¶ 11, at 5.   Under the automobile exception, Rodriguez did not need a warrant; he needed only to comply with the Fourth Amendment, by searching the vehicle where Rodriguez could reasonably expect the raw

marijuana to be located.  See United States v. Mirabal, 876 F.3d at 1033.  Rodriguez, detecting the marijuana odor outside of the car, could have reasonably believed that raw marijuana was stored in the vehicle's trunk and within the locked luggage.  Indeed, Rodriguez stated that because of the "strength of the odor," he expected that he would find a "large amount of marijuana" in the car.  Tr. at 96:14-24 (Rodriguez, Torgoley).

Although not required -- because under current precedent, the odor of raw marijuana alone establishes probable cause to search a vehicle where the marijuana may reasonably be expected to be located -- Rodriguez also noted other facts that contributed to his suspicions: (i) the inconsistent travel stories given by Diego Sena and Delores Sena; (ii) Phoenix, the city Delores Sena mentioned in her travel story, which Rodriguez knew as a "narcotics hub"; (iii) Diego Sena's nervousness; and (iv) the marijuana cartridge that Diego Sena produced from his pocket when Rodriguez asked what he had in his pockets.   This Court finds that the inconsistent travel stories contributed to Rodriguez' probable cause to search the vehicle, but the other facts contributed only negligibly to Rodriguez' probable cause.

"[I]nconsistent travel stories [were] the most important factor" in one case, where the driver and passenger "could not agree even on which state they had recently visited, much less the purpose of their trip."  United States v. Jackson, 235 F. App'x 707, 711 (10th Cir. 2007).  See United States v. Kitchell, 653 F.3d 1206, 1219 (10th Cir. 2011)("The motorist's or his passengers' inconsistent statements in response to such questions can give rise to reasonable suspicion of criminal activity.");  United States v. Kopp, 45 F.3d 1450, 1454 (10th Cir. 1995)(concluding that "implausible and inconsistent" stories from the driver and passenger contributed to reasonable suspicion to extend a traffic detention); United States v. Cash, 733 F.3d at 1275 (concluding that the defendant's "inconsistent statements and nervousness -- although far

from dispositive themselves -- contributed to the totality of circumstances" for reasonable suspicion (footnote omitted)). Here, Rodriguez first got Diego Sena's travel story, and he said they had come from Gallup.  See FOF ¶ 23, at 7.  Then, while Rodriguez was checking the vehicle's VIN, Delores Sena stated that they were coming from Phoenix.  See FOF ¶ 27, at 7. When Rodriguez returned to his police vehicle, he checked again with Diego Sena, asking whether he and his mother had travelled anywhere else.  See FOF ¶ 30, at 8.  Diego Sena reiterated that they had only travelled to Gallup.  See FOF ¶ 30, at 8.  The Court finds this inconsistency in travel stories highly significant.  Although the travel inconsistency alone would have only established reasonable suspicion, in combination with the smell of raw marijuana which Rodriguez detected while standing outside of the vehicle, the totality of circumstances constituted probable cause.

Rodriguez' statement that Phoenix was a "narcotics hub," however, contributes only negligibly to probable cause.  See FOF ¶ 28, at 7.  In one recent case, the "characterization of Arizona and Minnesota as drug hubs . . . add[ed] nothing to the reasonable suspicion calculus." United States v. Leon, 80 F.4th 1160, 1170, 1166 (10th Cir. 2023).  Although Phoenix is a more specific location than two entire states, the mere fact that a population center may be a "drug source city" does "little to add to the overall calculus of suspicion."  United States v. Guerrero, 472 F.3d 784, 787-88 (10th Cir. 2007).  See United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005)("If travel between two of this country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention.").  Indeed, the Tenth Circuit has given "no credence" to an officer's testimony that the defendant "was traveling on a major 'drug corridor.'"  United States v. Simpson, 609 F.3d 1140, 1152 n.3 (10th Cir. 2010).

"Because law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities, [ ] the probativeness of a particular defendant's route is minimal."  United States v. White, 584 F.3d 935, 951-52 (10th Cir. 2009).  The Court, therefore, concludes that Phoenix, as a major population center of the Southwest, adds almost nothing to Rodriguez' probable cause calculation.

Diego Sena's nervousness did not rise to the level of extreme nervousness required to contribute to an officer's suspicion, so his alleged nervousness contributes only negligibly to the totality of the circumstances under which Rodriguez had probable cause.  The Tenth Circuit has "consistently held that ordinary nervousness bears little weight in the reasonable suspicion calculus."  United States v. Leon, 80 F.4th at 1167.  In fact, nervousness "is a sufficiently common -- indeed natural -- reaction to confrontation with the police that unless it is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion, it is 'of limited significance in determining whether reasonable suspicion exists.'"  United States v. Santos, 403 F.3d 1120, 1127 (10th Cir. 2005)(quoting United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001)).  "[N]ervousness," however, "even if it may be a normal reaction, is still among the pertinent factors a reasonable law enforcement officer would analyze in investigating possible crimes, and should not be completely disregarded."  United States v. Johnson, 364 F.3d 1185, 1192 (10th Cir. 2004).  "[E]xtreme and continued nervousness" is "entitled to somewhat more weight" in evaluating probable cause.  United States v. West, 219 F.3d 1171, 1179 (10th Cir. 2000).  "The court examines specific indicia that the defendant's nervousness was extreme, rather than credit an officer's naked assertion."  United States v. Simpson, 609 F.3d 1140, 1148 (10th Cir. 2010).  In United States v. Leon, the officer described the defendant as "super nervous" because the officer found the defendant to be "overly

cooperative," giving "drawn out or roundabout answers," and "tr[ying] to control . . . the conversation." 80 F.4th at 1168. The officer also noted that the defendant's nervousness did not dissipate after being told he would only get a warning. See United States v. Leon, 80 F.4th at 1168. Contrary to the officer's belief, the Tenth Circuit found that the defendant "exhibited no physical manifestations of extreme nervousness" and was instead "cooperative and offered explanations to questions posed by" the officer. United States v. Leon, 80 F.4th at 1168. Indeed, "[t]he indicia of nervousness highlighted by [the officer] could also merely reflect [the defendant's] communication style rather than nervousness." United States v. Leon, 80 F.4th at 1168.

Here, Rodriguez determined that Diego Sena was nervous, because: (i) Rodriguez noticed a "slight shake in [Diego Sena's] hands" while Diego Sena located his license, see Police Report at 2; FOF ¶ 16, at 6, and described Diego Sena as "not knowing what to do with his hands" once inside Rodriguez' police vehicle, see Tr. at 87:4-8 (Rodriguez, Torgoley); (ii) Diego Sena was talkative and "trying to take over the conversation" and "derail" Rodriguez, see Tr. at 87:4-51 (Rodriguez, Torgoley); and (iii) Diego Sena's nervousness "stayed the same and gradually increased" after Rodriguez told him that he would only get a written warning, see Tr. at 86:23-87:3 (Rodriguez, Torgoley). The United States even concedes that Diego Sena's nervousness "shouldn't weigh too heavily" in the probable cause calculation. Tr. at 170:14-71:11 (Spindle). Rodriguez' analysis of Diego Sena's behavior is strikingly similar to the officer's descriptions in United States v. Leon, and the Court finds that, like the defendant in United States v. Leon, Diego Sena was "cooperative" and respectful when answering all of Rodriguez' questions. United States v. Leon, 80 F.4th at 1168. Thus, this Court finds that Diego Sena's "alleged

nervousness was not extreme and bears negligible weight in [the probable cause] calculus." United States v. Leon, 80 F.4th at 1168.

Finally, the marijuana cartridge that Diego Sena produced from his pocket had a negligible effect on Rodriguez' probable cause.  Because of the nature of the cartridge and the fact that it was not connected to a pen, Diego Sena could not have used the cartridge without a separate pen.  See FOF ¶ 19, n.5 at 6.  These facts suggest that Diego Sena purchased it at a dispensary rather than suggesting that he was trafficking contraband.  Because New Mexico and Arizona had legalized recreational marijuana at the time Diego Sena possessed this cartridge, see N.M.S.A. 1978, § 26-2C-25(A); see A.R.S. § 36-2852, his possession of the cartridge would have a negligible effect on Rodriguez' suspicion that he was trafficking a "large amount" of marijuana, which Rodriguez suspected based on the smell of raw marijuana, Tr. at 96:14-24 (Rodriguez, Torgoley).  Thus, although Diego Sena's nervousness, the fact that Rodriguez believed Phoenix to be a narcotics hub, and the marijuana cartridge had a negligible effect on Rodriguez' probable cause calculus, the inconsistency of Diego and Delores Sena's travel stories and the smell of raw marijuana established probable cause for Rodriguez to search the vehicle's trunk under the automobile exception -- in fact, the smell of raw marijuana alone established probable cause.

## II. RODRIGUEZ' ROADSIDE QUESTIONING OF DIEGO SENA DOES NOT VIOLATE DIEGO SENA'S FIFTH AMENDMENT RIGHTS, BECAUSE THE QUESTIONING DOES NOT CONSTITUTE A CUSTODIAL INTERROGATION AND DIEGO SENA'S STATEMENTS ARE VOLUNTARY.

Rodriguez' roadside questioning of Sena does not violate Sena's Fifth Amendment rights. The questioning does not constitute a custodial interrogation, and Diego Sena's statements are voluntary.  Accordingly, the Court denies the MTS.

A.   **RODRIGUEZ' ROADSIDE QUESTIONING OF DIEGO SENA DOES NOT VIOLATE DIEGO SENA'S FIFTH AMENDMENT RIGHTS, BECAUSE THE QUESTIONING DOES NOT CONSTITUTE A CUSTODIAL INTERROGATION.**

Rodriguez' questioning of Diego Sena before Diego Sena waives his Miranda rights does not constitute a custodial interrogation, because there was not "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" J.D.B. v. North Carolina, 564 U.S. at 270 (quoting Thompson v. Keohane, 516 U.S. at 112 (internal quotation marks, alteration, and footnote omitted in J.D.B. v. North Carolina)). Even if Rodriguez' questioning of Diego Sena is a custodial interrogation, Diego Sena's statements prior to his waiver of his Miranda rights do not taint his statements after his waiver of his Miranda rights. See Oregon v. Elstad, 470 U.S. at 318; United States v. Guillen, 995 F.3d at 1121; United States v. Pettigrew, 468 F.3d 626, 635 (10th Cir. 2006).

1.   **Rodriguez' Roadside Questioning of Diego Sena is not a Custodial Interrogation.**

"Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" United States v. Jones, 523 F.3d 1235, 1239 (10th Cir. 2008)(quoting United States v. Chee, 514 F.3d 1106, 1112 (10th Cir.2008)). See United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)("[T]wo requirements must be met before Miranda is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'"). "'[I]nterrogation' refers to 'either express questioning or its functional equivalent' -- i.e., 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. Cash, 733 F.3d 1264, 1277 (10th Cir. 2013)(quoting Rhode Island v. Innis, 446 U.S. 291, 300-01

(1980)).  Whereas the determination for custody is whether "a person [is] under formal arrest or ha[s] 'his freedom of action . . . curtailed to a degree associated with formal arrest.'"  United States v. Cash, 733 F.3d at 1277 (quoting United States v. Benard, 680 F.3d 1206, 1211 (10th Cir.2012)).

Brief detentions, often called Terry stops, have a "comparatively nonthreatening character" and are generally not "subject to the dictates of Miranda."  Berkemer v. McCarty, 468 U.S. at 440.  "The similarly noncoercive aspect of ordinary traffic stops prompts" the conclusion "that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda."  Berkemer v. McCarty, 468 U.S. at 440 (source of quoted material not cited).  An ordinary traffic stop conceivably may evolve into an interrogation that requires Miranda warnings, but only "when a reasonable person in the suspect's position would understand his or her situation as 'the functional equivalent of formal arrest.'"  United States v. Cortez, 965 F.3d at 840 (quoting United States v. Revels, 510 F.3d 1269, 1273 (10th Cir. 2007)).  This exception to the general rule occurs if officers "take highly intrusive steps to protect themselves from danger, [so then] they must similarly provide protection to their suspects by advising them of their constitutional rights."  United States v. Perdue, 8 F.3d 1455, 1465 (10th Cir. 1993).

To determine whether a reasonable person would understand their circumstances as the "functional equivalent of formal arrest," United States v. Chee, 514 F.3d 1106, 1112 (10th Cir. 2008)(quoting Berkemer v. McCarty, 468 U.S. at 442), courts in the Tenth Circuit must evaluate: (i) whether the suspect is informed that he or she may end the interview at will, or is not required to answer questions; (ii) whether the interview's nature likely is to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect.  See United

States v. Jones, 523 F.3d at 1240. The Tenth Circuit has been deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole, "from an examination of the totality of the circumstances," rather than exclusively relying on some enumerated factors while ignoring others. United States v. Jones, 523 F.3d at 1240. See United States v. Guillen, 995 F.3d 1095, 1109 (10th Cir. 2021)("This is an objective, fact-intensive inquiry that focuses on the totality of the circumstances.").

In United States v. Cortez, 965 F.3d 827, the Tenth Circuit held that the "general principle" that Miranda warnings are not required during Terry stops "controls" where officers are "conversational and non-threatening," following typical traffic protocols, and never mentions "physical restraints" or the officer's "firearm." 965 F.3d at 841. Similarly, in United States v. Eckhart, 569 F.3d 1263 (10th Cir. 2009), officers were not required to provide Miranda warnings where the defendant is "never handcuffed or placed in a police cruiser and no weapons were drawn," and officers "were polite in their demeanor and did not use or threaten the use of force at any time," not taking any "highly intrusive measures against" the defendant. 569 F.3d at 1276. Even when the officer "never told [the defendant] that he could decline to answer questions" nor that the defendant "was free to leave," a defendant was not in custody when the traffic stop occurred "in public view on the side of an interstate highway" at night and when "[t]here [wa]s no evidence that [the officer] 'threatened or aggressively questioned'" the defendant. United States v. Gaiter, No. 23-8037, 2024 WL 2845759, at *4 (10th Cir. 2024)(unpublished)(quoting United States v. Lamy, 521 F.3d 1257, 1264 (10th Cir. 2008)).

Here, Rodriguez' questions constitute an interrogation, but not a custodial interrogation. If Diego Sena agreed to do a controlled delivery, he also was admitting that he had planned to deliver the drugs to other people, which certainly is an incriminating admission. Thus,

Rodriguez "'should know'" his questions were "'reasonably likely to elicit an incriminating response from the suspect.'"   United States v. Cash, 733 F.3d 1264, 1277 (10th Cir. 2013)(quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)).

Rodriguez' roadside questioning of Diego Sena is not, however, a custodial interrogation, unless the "totality of the circumstances" and the "police-citizen encounter as a whole" suggests that Diego Sena is "in custody" for Miranda purposes.  United States v. Jones, 523 F.3d 1235, 1240 (10th Cir. 2008).  Applying the non-exhaustive factors in United States v. Jones, 523 F.3d 1235, Diego Sena is not in custody during Rodriguez' roadside questions.  See 523 F.3d at 1240. The first factor weighs slightly in favor of a determination of custody, because Rodriguez did not specifically state that Diego Sena was free to leave.  See FOF ¶ 32-49, at 8-11. Nevertheless, Rodriguez emphasized that it was Diego Sena's choice whether he wanted to agree to the controlled delivery: "It's up to you.  It's not up to me.  I'm not forcing you by any means, okay? I'm leaving it up to you guys, but time is of the essence to get it done."  See FOF ¶ 46, at 11.

The second United States v. Jones, 523 F.3d 1235, factor weighs against a finding of custody, because the "nature of questioning" was not "prolonged" or especially "accusatory," and the environment was not "coercive."  523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d at 1518).  Rodriguez conversationally questioned Diego Sena about what was in the trunk before searching the bags' contents and offered the option of a controlled delivery.  See FOF ¶ 43, at 10.  Rodriguez allowed Diego Sena to talk to his mother Delores Sena about the possibility of a controlled delivery, see FOF ¶ 44, at 10, and Rodriguez allowed Diego Sena to hug his mother while they decided what to do, see FOF ¶ 47, at 11.  Most of the questioning took place outside of the police vehicle, and Deigo Sena was never placed in handcuffs while discussing the option of a controlled delivery.  See FOF ¶¶ 32-49, at 8-11.

- 89 -

Finally, the third factor, "whether the police dominate the encounter," weighs against a determination of custody.  United States v. Jones, 523 F.3d at 1240.  Several factors indicate police domination of an encounter: (i) separating the suspect from "'family or colleagues who could offer moral support'"; (ii) isolating the suspect "'in nonpublic questioning rooms'"; (iii) the "'threatening presence of several officers'"; (iv) "'display of a weapon by an officer'"; (v) "'physical contact with the subject'"; and (vi) use of language or vocal tones "'implying that compliance with the request might be compelled.'"  United States v. Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)).  Here, Rodriguez employed none of these coercive strategies.  Rather than separate Diego Sena family, Rodriguez allowed Diego Sena to consult with and hug his mother while Diego Sena evaluated whether to agree to the controlled delivery.  See FOF ¶¶ 44, 47, at 10-11.  Instead of a "nonpublic questioning room," Diego Sena was questioned outside on the public highway.  Although Delores Sena expressed concern about them being seen talking to police officers, see FOF ¶ 48, at 11, the public nature still weighs against the police dominating the encounter.  Rodriguez spoke with Diego Sena individually, see FOF ¶ 43, at 10, and, when he discussed the controlled delivery with Diego and Delores Sena together, there was another officer standing to the side, see Rodriguez Lapel Footage at 34:40-37:30 (Rodriguez to Diego Sena).  The presence of one additional officer does not constitute a "threatening presence of several officers."  United States v. Jones, 523 F.3d at 1240.  Rodriguez and the other officer also never "display[ed]" their weapons in a threatening or dominating way; indeed, Rodriguez never mentioned his weapon.  United States v. Jones, 523 F.3d at 1240.  See FOF ¶¶ 32-49, at 8-11.  Further, Rodriguez mentioned handcuffs only in response to Diego Sena and Delores Sena resisting Rodriguez' vehicle search, stating that he would put Diego Sena in handcuffs if Diego Sena continued to

approach the vehicle or attempted to interrupt his search of the vehicle's trunk.  See FOF ¶ 40, at 9-10.  Many minutes after Diego Sena verbally agreed to the controlled delivery, Rodriguez placed Diego Sena in handcuffs to transport him to the gas station, as HSI requested.  See FOF ¶¶ 56-57, at 12-13.  This transfer was initiated primarily because Delores Sena had expressed concern for their safety for being seen on the highway's shoulder talking to the police by other members of the drug trade.  See FOF ¶ 48, at 11.  Finally, Rodriguez' language and tone was conversational and respectful, and not threatening or dominating.  See FOF ¶¶ 44, 47, at 10-11.

Evaluating the "totality of the circumstances" and the "police-citizen encounter as a whole," the Court concludes that Diego Sena was not in custody when Rodriguez questioned him.  United States v. Jones, 523 F.3d at 1240.  Thus, although Rodriguez' questions constitute an interrogation, Diego Sena was not questioned in a "custodial interrogation," so he is not entitled to a Miranda warning.  United States v. Perdue, 8 F.3d at 1463.  Moreover, the United States "does not intend to elicit any statements made by Defendant from the conclusion of the traffic investigation around 1:00 P.M. until his waiver of Miranda rights at approximately 2:45 P.M.," Response at 14, so the Court denies the motion to suppress Diego Sena's statements as moot, see United States v. Creech, 52 F. Supp. 2d 1221, 1232 (D. Kan. 1998)("In light of the government's agreement that it will not seek to introduce any of the defendant's admissions concerning the robberies, the defendant's motion to suppress those statements is denied as moot."), aff'd, 221 F.3d 1353 (10th Cir. 2000).

> **2.      Even if Rodriguez' Roadside Questioning of Diego Sena Is a Custodial Interrogation, Diego Sena's Statements Before His Miranda Waiver Do Not Taint His Statements After He Waived His Miranda Rights, Because Diego Sena Made All of His Statements Voluntarily.**

Even assuming that Diego Sena was entitled to a Miranda warning during Rodriguez'

roadside questioning, Diego Sena made both his pre- and post-Miranda waiver statements voluntarily, and the mere fact that he made statements before receiving a Miranda warning does not render his subsequent statements tainted.  See Oregon v. Elstad, 470 U.S. at 318 ("No further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary [ ] waiver. . . [A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." (source of quoted material not cited)).  But see United States v. Perdue, 8 F.3d 1455, 1468 (10th Cir. 1993)(holding that, when a defendant makes pre-Miranda warning statements involuntarily, the post-Miranda warning statements must be evaluated for the effect of the first, coerced confession on the second and "that the tense and coercive atmosphere that accompanied the initial constitutional violation pervaded the second phase of the interrogation as well").  When a defendant voluntarily makes incriminating statements before receiving a Miranda warning, if the defendant voluntarily confesses again -- this time after waiving his or her right to remain silent -- "the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights."  Oregon v. Elstad, 470 U.S. at 314; id. at 313 ("A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.").  The test differs, however, if officers maliciously employ a "two-step interrogation technique . . . in a calculated way to undermine the Miranda warning," whereby they intentionally omit Miranda warnings when eliciting a confession, and then provide the Miranda warning before attempting to elicit the same confession.  Seibert, 542 U.S. at 622 (Kennedy, J., concurring).  In such rare circumstances, the subsequent confession is invalid, "unless curative measures are taken before the postwarning statement is made."  Seibert,

542 U.S. at 622 (Kennedy, J., concurring).  But barring such intentional two-step interrogation technique, the inquiry simple: Was the defendant's second statement, "in fact," "also voluntarily made"?  Oregon v. Elstad, 470 U.S. at 318.

"The prosecution has the burden of proving by at least a preponderance of evidence that the confession was voluntary."  United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996).  "The due process test takes into consideration 'the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation.'"  Dickerson, 530 U.S. at 434 (quoting Schneckloth v. Bustamonte, 412 U.S. at 226).  But, in part because State action is required to elicit Constitutional protection, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  Connelly, 479 U.S. at 167.  Thus, the defendant's personal characteristics only become relevant in the voluntariness analysis if the Court first finds that the police officers' conduct was coercive.  See United States v. Young, 964 F.3d 938, 946 (10th Cir. 2020)(dividing voluntariness analysis into (i) police coercion and (ii) personal characteristics and specifying that, "because we agree that [the agent's] conduct was coercive, we turn to [the defendant's] personal characteristics to answer the ultimate question: whether [the defendant's] statements were voluntary"); United States v. Lopez, 437 F.3d 1059, 1064 (10th Cir. 2006)("[P]ersonal characteristics 'are relevant only if this court first concludes that the officers' conduct was coercive.'" (quoting United States v. Erving L., 147 F.3d 1240, 1249 (10th Cir.1998))); United States v. Rodebaugh, 798 F.3d 1281, 1290 (10th Cir. 2015)(noting the necessary predicate requirement of Connelly); Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004)(same).

In United States v. Guillen, officers questioned a defendant in his home, and although the

questions were "accusatory at one point," "the interview was not unduly prolonged" and "done in a conversational tone," never rising "to the level of coercion." 995 F.3d at 1123. See United States v. Rith, 164 F.3d at 1333 (concluding that the defendant's statements were voluntary because "[a]t no point during the search was [the defendant] threatened with or subjected to physical punishment by the officers; the questioning lasted no longer than forty-five minutes; and [the defendant] was in the comfortable surroundings of his home"). "[A] promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced." United States v. Lopez, 437 F.3d at 1064 (quoting Clanton v. Cooper, 129 F.3d 1147, 1159 (10th Cir.1997)). Some useful factors "indicative of involuntariness include: '[P]hysical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant.'" United States v. Torres-Castro, 374 F. Supp. 2d 994, 1027 (D.N.M. 2005)(Browning, J.)(quoting United States v. McCurdy, 40 F.3d 1111, 1119 (10th Cir. 1994)), aff'd, 470 F.3d 992 (10th Cir. 2006).

Here, there is no evidence to suggest that Rodriguez intentionally employed a two-step interrogation technique. In Seibert, the officer testified that he was trained to interrogate in the following order: "question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" Seibert, 542 U.S. at 606 (source of quoted material not cited). Rodriguez, far from intentionally giving Diego Sena a Miranda warning and trying to get the same answer, transferred Diego Sena to the federal agents never having given Diego Sena a Miranda warning nor formally placing Diego Sena under arrest. See FOF ¶ 63 at 14. Neither Rodriguez nor King testified that there was a "coordinated and continuing interrogation." Seibert, 542 U.S. at 613. Instead, once Rodriguez transferred Diego Sena to the

federal agents, his involvement in the case was solely to transport Diego Sena to the HSI office. See FOF ¶ 70 at 15; Tr. at 46:25-47:8 (Rodriguez, Spindle).  Indeed, Agent King did not know whether Rodriguez had provided Diego Sena with a <u>Miranda</u> warning.  See Tr. at 139:8-12 (King, Meyers)("Q: To your knowledge, had he been Mirandized at that point?  A: Not to my knowledge.  Q: Did you ask?  A: No, I didn't.").  Thus, rather than a "coordinated and continuing interrogation," there were two separate instances of questioning: (i) the first occurred on the side of the highway, when Rodriguez offered a controlled delivery, and Diego Sena discussed the option with his mother and accepted; (ii) the second happened once Diego Sena was in the HSI vehicle with Agents King and Beckford.  Thus, the <u>Elstad</u> framework, rather than the <u>Seibert</u> exception, controls.  See <u>Seibert</u>, 542 U.S at 622 (Kennedy, J., concurring)("The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed."); <u>United States v. Guillen</u>, 995 F.3d 1095, 1114 (10th Cir. 2021)("Justice Kennedy's concurrence is the binding opinion from *Seibert*.").

      **a.**    **Diego Sena's Roadside Statements Are Voluntary Because <u>Rodriguez Did Not Act Coercively</u>.**

For the <u>Elstad</u> framework to apply, Diego Sena's roadside statements to Rodriguez must have been voluntary.[24]  See <u>United States v. Rith</u>, 164 F.3d 1323, 1333 (10th Cir. 1999)(concluding that unless a defendant's pre-<u>Miranda</u> warning statement was involuntary,

---

[24]If a defendant's pre-<u>Miranda</u> warning statements were involuntary, "[t]he later confession will be admissible . . . 'only if such a distinction is justified by a sufficiently isolating break in the stream of events.'"  <u>United States v. Perdue</u>, 8 F.3d 1455, 1467–68 (10th Cir. 1993)(quoting <u>Leon v. Wainwright</u>, 734 F.2d 770, 772 (11th Cir. 1984)).  The Tenth Circuit specified that, in cases where "there was not only a violation of *Miranda*, but the initial confession was involuntary in violation of due process[,] . . . *Elstad* does not control."  <u>United States v. Perdue</u>, 8 F.3d at 1468.  This framework is inapposite here because Diego Sena's pre-<u>Miranda</u> warning statements were voluntary.  See Analysis Section II.A.2.a, infra, at 95-97.

"*Elstad* applies and [the defendant] may not avail himself of the fruit-of-the-poisonous-tree argument"). The Court concludes that Diego Sena's roadside statements, namely his agreement to the controlled delivery, were voluntary. "The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." United States v. Rith, 164 F.3d 1323, 1333 (10th Cir. 1999). Whether Rodriguez acted coercively is an "inquiry [ ] based on the totality of the circumstances." United States v. Young, 964 F.3d 938, 946 (10th Cir. 2020). In evaluating the coerciveness of an interrogation, the Tenth Circuit considers the following non-exhaustive factors: "'[W]hether the suspect was advised of his or her constitutional rights, the length of his or her detention, the nature of the questioning, and any physical punishment such as deprivation of food or sleep.'" United States v. Young, 964 F.3d 938, 945 (10th Cir. 2020)(quoting Sharp v. Rohling, 793 F.3d 1216, 1233 (10th Cir. 2015)). Even if none of those factors apply however, an officer's conduct may be "coercive in nature" if the officer "misrepresents" what the defendant will receive in return for confessing or makes "promises of leniency." United States v. Young, 964 F.3d at 946. The mere "fact that an officer promises to make a defendant's cooperation known to prosecutors will not produce a coerced confession," United States v. Lopez, 437 F.3d at 1064, and "limited assurance does not taint ensuing statements as involuntary," United States v. Lewis, 24 F.3d 79, 82 (10th Cir. 1994). But when an officer promises a lenient sentence in exchange for a confession, the officer acts coercively. See United States v. Lopez, 437 F.3d at 1065. And such coercive promises of leniency are likely to render a confession involuntary. See United States v. Lopez, 437 F.3d at 1065 (involuntary confession when an officer "promise[d] [the defendant] that he would spend fifty-four fewer years in prison if he would confess to killing [the victim] by mistake"); United States v. Young, 964 F.3d 938, 944 (10th Cir. 2020)(involuntary confession

when the officer told the defendant he could "'physically buy down' the length of the sentence and that each truthful response would 'tick[ ] time off' his sentence."); Sharp v. Rohling, 793 F.3d 1216, 1234 (10th Cir. 2015) (concluding a defendant's confession was involuntary after the officer promised "no jail" because the promise "[wa]s of the sort that may indeed critically impair a defendant's capacity for self-determination." (quoting United States v. Lopez, 437 F.3d at 1065)(alterations in Sharpe v. Rohling, not United States  v. Lopez)).  But see United States v. Dowell, 430 F.3d 1100, 1108 (10th Cir. 2005)("While 'a promise of leniency is relevant to determining whether a confession was involuntary,' this court considers that as only one factor to be considered within the totality of the circumstances."); id. at 1108 (affirming district court's holding that the confession was voluntary because there was insufficient evidence of a factual dispute to warrant an evidentiary hearing and the federal agents' estimation of the defendant's sentence "appear[ed] fairly accurate").

Here, Rodriguez did not promise leniency and only offered extremely "limited assurance" by stating "I don't know, but usually when people cooperate, it lessens stuff for them."  See FOF ¶ 45, at 10.  Although Rodriguez did not advise Diego Sena of his constitutional rights, the questioning was short in length, outdoors, and Rodriguez said: "It's up to you.  It's not up to me. I'm not forcing you by any means, okay?  I'm leaving it up to you guys, but time is of the essence to get it done."  FOF ¶ 46, at 11.  Rodriguez allowed Diego Sena to talk to and hug his mother while they decided whether to agree to the controlled delivery.  See FOF ¶¶ 44, 47, at 10-11.  Rodriguez did not use or threaten force when discussing the option of a controlled delivery and only mentioned handcuffs in response to Diego Sena walking toward the car during Rodriguez' search or in warning Diego Sena not to "interrupt" or "mess with" Rodriguez as he searched the vehicle's trunk.  See FOF ¶ 40, at 9-10.  Based on the "totality of the

circumstances," the Court concludes that Rodriguez did not act coercively.  United States v. Young, 964 F.3d at 946.  The United States has met its burden to prove the confession was voluntary by a preponderance of the evidence.  See United States v. McCullah, 76 F.3d at 1100; Seibert, 542 U.S. at 608 n.1.  Because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment," Connelly, 479 U.S. at 167, the Court concludes that Diego Sena's roadside statements to Rodriguez were voluntary.

>           **b.      Diego Sena's Second Confession Is Voluntary Because King and Beckford Did Not Act Coercively.**

Because Diego Sena's first statements are voluntary, whether the post-Mirandized statement was "tainted" by the initial lack of Miranda warnings is a straightforward inquiry: Was the defendant's second statement, "in fact," "also voluntarily made"?  Oregon v. Elstad, 470 U.S. at 318.  The same governing rules apply for a voluntariness analysis.  Here, King and Beckford went to notable lengths to ensure that Diego Sena's waiver of rights was knowing and voluntary, even having him read aloud the Miranda Waiver Form himself before signing it.  See FOF ¶ 66, at 14-15.  While reading the statement aloud, Diego Sena asked what the word "waiver" meant, and the agents defined it as: "Do you wish to talk to us?"  FOF ¶ 66 n.8., at 14.  See HSI Vehicle Interview Audio Recording at 2:25-2:30 (Beckford, Diego Sena, King); Tr. at 144:24-145:15 (King, Meyers).  The definition of "waiver" by itself, however, is not dispositive of whether Diego Sena understood that he had rights and, understanding his rights, opted to speak with the agents.  It is possible, for example, for someone not to know the definition of "search engine" and still know how to find information using Google.  Here, even if Diego Sena never fully understood what "waiver" means, he still had his rights read to him and then read his rights aloud

himself.  See FOF ¶ 66, at 14-15.  Only after such exposure to his rights did he sign the Miranda Waiver Form.   See FOF ¶ 67, at 15.  At that time, Diego Sena "wish[ed] to talk to" the agents. FOF ¶ 66 n.8., at 14.  After he signed the Miranda Waiver Form, Diego Sena never resisted the interview or tried to stop it.   See FOF ¶ 67, at 15; Tr. at 129:18-130:1 (Eagle, King).  Overall, nothing in the record suggests that King or Beckford acted coercively during their interview with Diego Sena.   Again, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary,'" Connelly, 479 U.S. at 167, so the Court concludes its voluntariness analysis for King and Beckford's interrogation of Diego Sena and determines that Diego Sena's statements to King and Beckford were voluntary.  Therefore, even if Rodriguez' roadside questioning of Diego Sena constituted a custodial interrogation, Diego Sena's pre-Miranda warning statements would not exclude his post-Miranda warning statements, because all statements were made "'voluntar[il]y' within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 167.

In conclusion, each step in the series of events of July 10, 2023, is Constitutionally permissible.  Rodriguez' search of the vehicle's trunk is Constitutionally permissible, because Rodriguez possessed probable cause to extend the traffic stop, when only reasonable cause is required.  See Section I.A, supra, at 70-73.  Because Rodriguez smelled raw marijuana, he possessed probable cause to search the vehicle's trunk under the automobile exception, and the conflicting travel stories further contributed to Rodriguez' probable cause calculus.  See Section I.B, supra, at 73-85.   Moreover, Rodriguez' roadside questioning of Diego Sena was Constitutional because Miranda warnings are only required where the defendant is questioned in a "custodial interrogation," and, although Rodriguez' questions constitute an interrogation, Diego Sena was not "in custody."  See Section II.A.1, supra, at 86-91.  Last, even if Diego Sena

was entitled to a Miranda warning before Rodriguez' roadside questions, Diego Sena's statements were voluntary -- both before and after he signed the Miranda Waiver Form.  See Sections II.A.2.a-b supra, at 95-99.  Thus, Diego Sena's post-Miranda statements are admissible. In conclusion, Diego Sena's Constitutional rights were not violated by the trunk's search or Rodriguez or King and Beckford's questioning.  Accordingly, the Court will not suppress the evidence found in the trunk or Diego Sena's statements and denies the MTS.

  **IT IS ORDERED** that the Defendant's Motion to Suppress, filed March 11, 2024 (Doc. 38), is denied.

                _____

                UNITED STATES DISTRICT JUDGE

*Counsel:*

Alex M. M. Uballez
 United States Attorney
Rachel Eagle
Joseph Michael Spindle
 Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Shaheen P. Torgoley
Ryan Rapp Pacheco & Kelley, PLC
Phoenix, Arizona

-- and --
Joel R. Meyers
The Law Office Of Joel R Meyers LLC
Santa Fe, New Mexico

   *Attorneys for the Defendant*

- 100 -